Lakisha **REYNOLDS**, Georgina Bonilla, April Smiley, Lue Garlick, Adriana Calabrese, Jenny Cuevas, and Elston Richards on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Rudolph **GIULIANI**, as Mayor of the City of New York; Jason Turner, as Commissioner of the City of New York Human Resources Administration; Brian J. Wing, as Commissioner of the New York State Office of Temporary and Disability Assistance; and Dennis Whelan, as Commissioner of the New York State Department of Health, Defendants.

No. 98 Civ. 8877(WHP).

United States District Court, S.D. New York.

May 24, 1999.

Hwan-Hui Helen Lee, The Legal Aid Society, New York, NY, Marc Cohan, Rebecca L. Scharf, Welfare Law Center, Inc., New York City, Mary Ellen Burns, Northern Manhattan Improvement Corp., New York City, Constance P. Carden, New York Legal Assistance Group, New York, NY, for plaintiffs.

Jonathan Pines, Assistant Corporation Counsel, New York City, for the City defendants.

James M. Hershler, Assistant Attorney General, New York City, for the State defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

Defendants Rudolph Giuliani, Mayor of the City of New York, and Jason Turner, Commissioner of the New York City Department of Social Services, (the "City defendants") move to modify a preliminary injunction entered by this Court on January 25, 1999. *See Reynolds v. Giuliani*, 35 F.Supp.2d 331 (S.D.N.Y.1999). For the reasons that follow, the City defendants' motion is granted in part and denied in part.

### Background

Beginning in March 1998, the New York City Human Resources Administration ("HRA") began to revamp its procedures concerning the administration of Food Stamps, Medicaid and cash assistance to needy applicants in an effort to implement various changes in federal and State law. In particular, HRA began to convert its existing "income support centers" to "job centers" where a greater emphasis is placed on moving applicants towards self-sufficiency through employment.

On December 16, 1998, plaintiffs moved by order to show cause for a preliminary injunction on behalf of a putative class of individuals who had been denied food stamps, Medicaid and cash assistance despite their alleged eligibility and dire need. Following a three-day evidentiary hearing on January 20, 21 and 22, 1999, this Court granted plaintiffs' application and enjoined the City defendants from opening new job centers or converting income support centers until the City formulated a corrective action plan that addressed apparent systemic violations of federal and State law.

The City defendants filed a corrective action plan on February 10, 1999. Over the next eight weeks, the parties conducted discovery and litigated the sufficiency of the City's initial proposals. During that period, the City defendants made numerous revisions to the Plan's policy directives, brochures, and forms in response to the plaintiffs' comments and objections. The Plan that emerged from that metamorphic process was materially different than the Plan submitted by the City defendants on February 10, 1999. The Court heard oral argument on the sufficiency of the corrective action plan on April 29, 1999.[1]

*Discussion*

A. *The Applicable Standard*

 When modifying a preliminary injunction, a court is charged with exercising the same discretion it exercised in granting or denying the injunction in the first instance. *See Sierra Club v. United States Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir.1984). "An injunction is an ambulatory remedy that marches along according to the nature of the proceeding. It is executory and subject to adaption as events may shape the need, except where rights are fully accrued or facts are so nearly permanent as to be substantially impervious to change." *Id.* at 256.

The testimony and other evidence adduced at the evidentiary hearing prompted this Court to express concern that the urgent needs of numerous individuals, including children, expectant mothers, and the disabled, were being overlooked as HRA endeavored to convert income support centers into job centers. *See Reynolds*, 35 F.Supp.2d at 339. At that time, the City defendants asserted, and they continued to argue, that processing errors occur infrequently and that isolated mistakes are inevitable in a system that processes thousands of applications per week.[2] The City defendants argue that since they have formulated and started to implement a detailed corrective action plan, any risk of irreparable harm to the plaintiffs has been extinguished. The City's Plan as it emerged on April 29, 1999 is outlined below.

B. *The Corrective Action Plan*

This Court's January 25 Order identified six areas of concern to be addressed in the City defendants' corrective action plan. The City's six-part Plan is organized to correspond with those six areas of concern.

Item A of the corrective action plan sets forth procedures to permit applicants to file an application for food stamps, Medicaid, or cash assistance on the first day of contact with a job center. Under the City's plan, an applicant's completion of the revised Applicant Job Profile ("AJP") form starts the application process. Plaintiffs initially objected to HRA's use of the AJP form primarily because it had not been approved by the New York State Office of Temporary and Disability Assistance or the New York State Department of Health. However, in March 1999, those agencies approved a revised version of the

---

1. The parties' submissions to the Court are voluminous. The papers consist of the following: City defendants' Job Center Action Plan (2/10/99); City defendants' Exhibits (separate bound volume) (2/10/99); Plaintiffs' Comments on the City's Corrective Action Plan (2/19/99); Declaration of Jonathan Pines in Response (3/15/99); Declaration of Hannah Cohen in Response (3/15/99); Declaration of Jean Sheil in Response (3/16/99); Declaration of Seth Diamond in Response (3/16/99); Declaration of Jacquelyn Flaum in Response (3/16/99); City's Revised and Additional Exhibits (separate bound volume) (3/16/99); Pines Supplemental Declaration re: Revised

Exhibits (3/25/99); Plaintiffs' Reply Comments (3/29/99); Supplemental Declaration of Jonathan Pines (5/3/99); Declaration of Jacquelyn Flaum (5/3/99); Declaration of Andrew S. Bush (5/3/99); Declaration of Patricia M. Smith (5/3/99); and Plaintiffs' Reply Declaration of Marc Cohan (5/3/99).

2. According to the City defendants, between February 15 and March 12, 1999, approximately 7,768 individuals visited job centers seeking some form of assistance. (May 3, 1999 Bush Decl. ¶ 8.)

AJP form. Thus, plaintiffs' objection to HRA's use of the AJP form is moot.

Item B of the corrective action plan sets forth procedures for ensuring separate determinations of eligibility for food stamps, Medicaid, and cash assistance. Under the Plan, the AJP form has been revised to prompt the applicant to make independent decisions concerning withdrawal from the application process for each category of benefit. Additionally, the AJP contains a Medicaid Application Option form in which the applicant is asked whether he wants a separate Medicaid determination if his cash application is denied. Medicaid brochures and food stamp brochures, which are distributed on the first day, have been amended to alert applicants that they may be entitled to Medicaid and food stamps irrespective of whether their cash assistance application is withdrawn or denied.

Furthermore, in response to comments from the plaintiffs, the City defendants have revised the administrative procedures set forth in the Plan. For example, HRA has revised its procedures so that applicants who fail to appear at an "I" interview may call their job center within thirty days of filing the AJP form to arrange an interview with the food stamp office. Defendants have also clarified their instructions to reflect that a separate determination on Medicaid eligibility is required for applicants who fail to comply with Eligibility Verification and Review ("EVR") requirements.

Item C of the corrective action plan establishes procedures for processing applications for food stamps, Medicaid, and cash assistance within seven days of filing. The City defendants have revised the AJP form so that questions regarding emergency assistance and immediate needs are located on the first page in bold print. Additional information regarding the Expedited Food Stamp Interview has also been added to the AJP. The AJP form now contains space for HRA personnel to indicate whether a referral to the Emergency Cash Assistance Team ("ECAT") was made. Furthermore, if emergency assistance is denied, HRA staff must specify the reason for such denial. Staff are also instructed that applicants who have a food emergency must receive an Expedited Food Stamp Interview on the same day, and that food pantries are not to be used as substitutes for the issuance of expedited food stamps.

In response to plaintiff's concerns, the City defendants made additional revisions to the Plan's policy directives so that HRA personnel are instructed to determine eligibility for expedited food stamps first, and then determine if an immediate needs grant is needed. In addition, HRA personnel are instructed that expedited food stamps are to be provided even in cases where friends and neighbors are willing to provide food to the applicant.

Item D of the corrective action plan deals with procedures for processing applications for immediate cash assistance in a manner consistent with State law. The Plan's policy directives instruct HRA staff that emergencies regarding food, shelter, utilities, and domestic violence must be investigated at once by referring the applicant for an immediate ECAT interview. If the applicant meets the eligibility criteria, an immediate cash grant must be provided on the same day. The directives also inform staff of the steps that must be taken if an applicant with an emergency has received an immediate needs grant, but has failed to complete the initial application process within thirty days. Under the Plan, signs entitled "What You Should Know If You Have an Emergency?" are to be posted in the job centers.

Item E of the corrective action plan establishes procedures for processing applications for food stamps and Medicaid when applicants fail to comply with work requirements. Federal food stamp law permits the agency to require applicants for food stamps to engage in job search and other work activities unless they are specifically exempt from the work require-

ments. Accordingly, the policy directives identify those categories of applicants that are exempt from work requirements. HRA has also modified its policy directives to clarify that an individual is disqualified for food stamps when he "refuses" to comply with work requirements, as opposed to when he "fails" to comply with work requirements. HRA staff are instructed that in all instances, food stamp work requirements are not applicable to Medicaid.

Item F of the corrective action plan contains procedures for providing written notice to applicants when their applications for food stamps, Medicaid, and cash assistance are denied. The City defendants have promulgated directives to provide that when a case is transferred to a non-public assistance food stamp agency, a notice is sent to the applicant. HRA has also modified another policy directive to provide for notice to applicants of their eligibility for expedited processing of their food stamp application.

The policy directives have been revised to instruct HRA personnel that when an applicant refuses to comply with the food stamp registration requirement, and therefore is disqualified for food stamps, notice of the consequences of such refusal must be provided to the applicant. The policy directives require that the notice indicate the specific time period of disqualification and the applicant's right to re-apply at any time during the sanction period.

D. *Sufficiency of the City Defendants' Corrective Action Plan*

■ Although the City defendants incorporated a number of plaintiffs' recommendations concerning the corrective action plan, they did not adopt all of them. Thus, plaintiffs argue, among other things, that HRA will continue to deny benefits for applicants who simply fail to appear at the "I" interview, and not merely those who refuse to be interviewed. They also contend that Medicaid eligibility should be determined at job centers rather than at a referral site when a cash assistance appli-

cation is denied. Furthermore, plaintiffs remain concerned that applicants with emergency needs who arrive at the wrong job center based on the applicant's zip code will be improperly turned away by the Receptionist without the Financial Planner having made a preliminary determination of eligibility for expedited assistance. Plaintiffs also object to the lack of detailed procedures for processing immediate cash assistance applications at the two existing job centers that do not have ECAT teams in place.

The foregoing discussion does not summarize every detail of the Plan or reiterate all of plaintiffs' objections. This Court has carefully considered plaintiffs' arguments concerning the adequacy of the Plan. Many of the potential discrepancies and inconsistencies identified by plaintiffs are remote and conjectural. On the whole, the City defendants' corrective action plan sufficiently addresses the six areas of concern in this Court's January 25 Order. The Court declines to tinker with the nuts and bolts of the comprehensive approach that the City defendants have formulated and begun to implement.

The preliminary injunction issued by this Court, preventing any further conversion of the income support centers into job centers was just that, a preliminary injunction. The mere fact that a hearing was held does not convert the preliminary injunction into a permanent one. The injunction was issued as a temporary freeze on the conversion of income support centers while the City defendants prepared a sufficient corrective action plan to ensure compliance with federal and State law. At this stage in the proceedings, the Court need not make a final determination on the sufficiency of the corrective action plan, but rather it must determine how to tailor the preliminary injunction to preserve the status quo.

While the City defendants' corrective action plan represents a significant step, it remains to be seen whether the Plan's

numerous policy directives will yield salutary results at job centers. The City defendants have submitted the results of two internal audits which they claim demonstrate the Plan's successful implementation. However, given the nature of the rights at stake, this Court is inclined to proceed cautiously. In such a complex system, the translation of theory into practice presents unique challenges in terms of training HRA personnel and measuring the effectiveness of the Plan's initiatives.

### C. Implementation of the City Defendants' Corrective Action Plan

#### 1. Training

The City defendants acknowledge in their corrective action plan that a successful transition from income support centers to job centers requires intensive training and effective implementation. HRA's Office of Staff Development and Policy Communication ("SDPC") has developed a training program where a full-time Staff Development Coordinator is assigned to each of the existing job centers and income support centers. The coordinator is responsible for on-site training at that center.

Before an income support center is converted to a job center, all front-line staff receive training. Since February 1999, HRA has conducted four separate rounds of training to ensure that HRA staff and supervisors understand and follow the new policies and procedures. HRA also implemented reinforcement training on specific topics such as issuance of expedited food stamps, immediate needs grants, and time limits and procedures for filing applications. HRA monitors the effectiveness of the training programs based on employee feedback and internal auditing.

Plaintiffs challenge the adequacy of the Plan's training component, arguing that the details of the training process are vague and that there are insufficient safeguards to ensure that HRA personnel receive and understand the new training.

Plaintiffs further urge that HRA should also be required to maintain attendance lists and establish protocols for when staff members miss training sessions. In response, City defendants maintain that compliance with the new policies and procedures is assessed through case reviews, spot checks, and quality control audits.

This Court finds that the training procedures promulgated by the City defendants are sufficient. HRA cannot be required to formulate a training program that incorporates all conceivable teaching aids. Rather, in light of this Court's January 25 Order, HRA was required to develop a training program in a relatively short time frame that promised to work. HRA appears to have accomplished that goal. Like other aspects of the corrective action plan, the training component was revised by the City defendants after their February 10 submission. At oral argument, the City defendants represented that over 3,000 personnel had received training. (Apr. 29, 1999 Tr. at 47.) This Court declines to micro-manage that process. Considerations of federalism preclude unnecessary intrusions on managerial prerogatives of local governments. *See Missouri v. Jenkins,* 495 U.S. 33, 51, 110 S.Ct. 1651, 1663, 109 L.Ed.2d 31 (1990). The question of whether judicial retooling of the Plan's training component is necessary should only be addressed retrospectively through the prism of experience.

#### 2. Preliminary Audit Results Concerning the Corrective Action Plan

██ Since this Court issued its January 25 Order, the parties requested and consented to a number of extensions to complete their respective submissions regarding the corrective action plan. The extended briefing schedule provided the parties and the Court with a glimpse of the implementation process and its preliminary effects.

In February and March 1999, HRA's Family Independence Administration ("FIA") conducted audits of the City's six-

teen income support centers and thirteen job centers in an effort to monitor the accuracy and timeliness of immediate needs assistance and expedited food stamp issuance, the separability of food stamp and Medicaid eligibility determinations, and the adequacy of notices of denial. (May 3, 1999 Flaum Decl. ¶ 2.) The March audit reflects data generated in February when the first round of corrective training was underway but not yet completed. Thus, a significant portion of the March audit reviewed applications processed prior to the training contemplated by the Plan.

Although the City defendants contend that the March 1999 audit demonstrates improved accuracy in processing applications at job centers, plaintiffs dispute the reliability of the City's data and draw contradictory inferences from the statistics.[3] Plaintiffs argue that the audits are fundamentally flawed as monitoring tools because the sample sets are not statistically weighted to account for the varying caseloads at the different centers, and because the small sample size results in a large sampling error. Plaintiffs' calculations derived from the same audit data show error rates that are significantly higher than the City defendants' computations. For instance, plaintiffs conclude based on the March audit that 26% of the expedited food stamp denials in February were invalid, versus the City's figure of 8%. (May 5, 1999 Cohan Decl. ¶ 15.) Plaintiffs assert that an evidentiary hearing with expert testimony is necessary to evaluate the data and determine whether the stay against future conversion should be lifted.

The disparities between the parties' calculations underscores the need for reliable, uniform audit procedures and statistically valid monitoring protocols. While data may always be subject to differing inter-pretations, the parties cannot even agree on the validity of the data set. Plaintiffs' arguments concerning sample size and weighting raise legitimate questions that cannot be resolved on the current record. Nevertheless, the City defendants have advanced a feasible corrective action plan which, taken together with the training program, has the potential to work. For all these reasons, the Court rules as follows.

The sixth decretal paragraph of this Court's January 25 Order is modified to the extent that the City defendants are permitted to convert three (3) additional income support centers to job centers at this time. This Court will consider a further modification of its preliminary injunction on the conversion of income support centers to job centers, or the opening of new job centers, after a hearing and determination on the adequacy of the City defendants' auditing procedures for job centers and an analysis of the data collected pursuant to those procedures. The City defendants may amend or supplement their existing procedures or may demonstrate that their existing procedures are reliable and valid. In either event, this Court expects that additional data for the months of March, April, and May will be available for analysis so that the Court can be more fully informed as to whether the reforms contemplated by the corrective action plan are translating into practice.

The Court will conduct a pretrial conference on the nature and scope of the parties' proposed submissions concerning the City defendants' auditing procedures and the results of implementation of the corrective action plan at job centers on June 3, 1999 at 3:00 p.m.

---

**3.** According to the City defendants' analysis, the February audit indicated that immediate needs grants were incorrectly denied in 17.4% of cases. In the March audit, the error rate allegedly dropped to 7.8%. Similarly, the percentage of incorrect denials of expedited food stamps purportedly fell from 17.4% to 8% during the same time period. The City defendants also contend that the error rate for separate determinations of Medicaid eligibility fell from 7.8% to 4.4%.