Lakisha REYNOLDS, Georgina Bonilla, April Smiley, Lue Garlick, Adriana Calabrese, Jenny Cuevas, and Elston Richards on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Rudolph GIULIANI, as Mayor of the City of New York; Jason Turner, as Commissioner of the New York City Human Resources Administration, Brian J. Wing, as Commissioner of the New York State Office of Temporary and Disability Assistance; and Barbara Debuono, as Commissioner of the New York State Department of Health, Defendants.

No. 98 Civ. 8877(WHP).

United States District Court, S.D. New York.

July 21, 2000.

Marc Cohan, Rebecca L. Scharf, Hwan–Hui Helen Lee, Legal Aid Society, Mary Ellen Burns, Northern Manhattan Improvement Corp., Constance P. Carden, New York Legal Assistance Group, New York City, for Plaintiffs.

Charles A. Miller, Caroline M. Brown, Covington & Burling, Washington, DC, Jonathan Pines, Assistant Corporation Counsel, New York City, for City Defendants.

James M. Hershler, Office of the Attorney General of the State of New York, New York City, for State Defendants.

## MEMORANDUM & ORDER

PAULEY, District Judge.

This action involves class-based allegations that certain policies and practices of the New York City Human Resources Administration, the New York State Office of Temporary and Disability Assistance, and the New York State Department of Health have the effect of preventing eligible individuals from applying for and timely receiving food stamps, Medicaid and cash assistance benefits. This memorandum and order addresses three motions.

First, New York City Mayor Rudolph Giuliani and Jason Turner, Commissioner of the New York City Human Resources Administration (the "City defendants"), move to vacate the preliminary injunction entered by this Court on January 25, 1999 and modified on May 24, 1999. Additionally, defendants Brian J. Wing, Commissioner of the New York State Office of Temporary and Disability Assistance, and Barbara DeBuono, Commissioner of the New York State Department of Health (the "State defendants"), move for an order, pursuant to Fed.R.Civ.P. 12(b)(6), dis-

missing the complaint as against them. Finally, plaintiffs Lakisha Reynolds, Georgina Bonilla, April Smiley, Lue Garlick, Adriana Calabrese, Jenny Cuevas and Elston Richards move for an order, pursuant to Fed.R.Civ.P. 23, certifying as class plaintiffs "[a]ll New York City residents who have sought, are seeking, or will seek to apply for food stamps, Medicaid, and/or cash assistance from City defendants at Job Centers." (Compl. ¶ 61)

The facts of this case, together with the statutory and regulatory framework underlying plaintiffs' claims, are set forth in two prior memoranda and orders of this Court, familiarity with which is assumed. *See Reynolds v. Giuliani*, 35 F.Supp.2d 331 (S.D.N.Y.1999) (*"Reynolds I"*); *Reynolds v. Giuliani*, 43 F.Supp.2d 492 (S.D.N.Y.1999) (*"Reynolds II"*). However, given the complexity of this litigation and the substantial evidentiary record that the parties have amassed, it is useful to summarize the factual background and procedural posture of the action before turning to the pending motions.

## Background

Until March 1998, New York City's Human Resources Administration ("HRA") accepted and processed applications for public assistance at offices known as income support centers. Thereafter, HRA began converting its 31 income support centers to "job centers" in an effort to implement the changes in federal and State welfare policy wrought by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 ("PRWORA"), Pub.L. No. 104–193, 110 Stat. 2105 (Aug. 22, 1996).

PRWORA changed welfare programs in New York and around the country by, among other things, ending the Aid to Families with Dependent Children ("AFDC") program and replacing it with a block grant program known as the Temporary Assistance to Needy Families ("TANF"). TANF introduces mandatory work requirements and limits the amount of time that a person can collect benefits. *See, e.g.,* 42 U.S.C. § 607 (detailing mandatory work requirements for those receiving TANF benefits); 42 U.S.C. § 602(a)(1)(A)(ii) (requiring TANF recipients to work when they are determined to be ready to work, or after twenty-four months of benefits, whichever is earlier); 42 U.S.C. § 608(a)(1)(B) (forbidding states from using TANF money to assist a family if an adult in the family has received assistance for sixty months). New York passed its own welfare reform legislation in August 1997 and participates in TANF through two cash assistance programs: Family Assistance, which is available to pregnant women and families with a minor child, and Safety Net Assistance, which is available to childless adults. *See* N.Y. Social Services Law §§ 158 and 349.

In New York City, these public assistance programs are administered by HRA's Family Independence Administration ("FIA"). Since public assistance recipients are generally eligible for food stamps and Medicaid, FIA oversees the application process for individuals seeking a combination of benefits. (Smith Decl. ¶ 2) However, FIA is not directly responsible for eligibility determinations for food stamps or Medicaid. Instead, applicants seeking these benefits at job centers or income support centers are referred to separate agencies for eligibility determinations. (*Id.*) This division of responsibility for processing non-public and public assistance applications predates HRA's program of converting income support centers to job centers. (*Id.*)

Another important division within HRA is the Office of Quality Assurance ("OQA"), which is responsible for "preserving the quality, efficiency, and financial integrity of FIA's programs." (Abdullah Decl. ¶ 2) One of OQA's functions is to replicate the quality control reviews of food stamp eligibility conducted by federal and state agencies. Under the federal food stamps program, states with relatively high error rates may face sanctions by way of a re-

duction in federal funding.[1] *See* 7 U.S.C.A. § 2025(d). OQA sends monitoring personnel out to centers to attempt to predict and minimize HRA's payment error rate.

At the present time, HRA operates twelve income support centers and sixteen job centers. In 1999, FIA merged four income support centers into two, converted three income support centers into job centers, and closed one income support center. The application process for public assistance at job centers is more rigorous than at income support centers, as job centers place greater emphasis on job search and employment activities for those able to work. Last year, HRA's job centers and income support centers received and processed approximately 168,000 public assistance applications and assisted approximately 350,000 individuals in engaging in employment activities. (Smith Decl. ¶ 3)

### Procedural History

Plaintiffs commenced this action by order to show cause in December 1998 seeking, *inter alia*, a temporary restraining order enjoining the conversion of additional income support centers to job centers. Plaintiffs alleged that HRA's staff at job centers were routinely preventing prospective applicants from applying for benefits during their first visit to a job center, pressuring applicants to withdraw their applications, improperly denying combined applications for cash assistance, food stamps and Medicaid when only cash assistance had been denied, and failing to provide adequate notice of determinations. The complaint asserted private rights of action under federal food stamps and Medicaid statutes and regulations, including the right to apply for such benefits without delay and to receive timely determinations of eligibility. The complaint also set forth claims under 42 U.S.C. § 1983 based on alleged violations of these statutes and regulations as well as plaintiffs' federal due process rights.

Following a period of expedited discovery, this Court conducted a three-day evidentiary hearing in January 1999. On January 25, 1999, this Court held in *Reynolds I* that plaintiffs had established irreparable harm and a likelihood of success on their claims. The Court rejected the City defendants' argument that the errors and deficiencies at job centers were isolated problems. On the contrary, the evidence pointed to system-wide failures resulting from HRA's hurried conversions of income support centers to job centers and its incremental, *post hoc* responses to what appeared to be an array of serious and interrelated problems.

At the hearing, the Court heard evidence that HRA had opened its first job center in March 1998 as a test-bed with the intention of addressing problems as they arose. *See Reynolds I*, 35 F.Supp .2d at 341. The evidence demonstrated that problems abounded. Data proffered by plaintiffs revealed sharp declines in applicants being approved for benefits after an income support center was converted to a job center. Those declines appeared attributable to the efforts of job center personnel to deter applicants from applying for food stamps, Medicaid and cash assistance. *See Reynolds I*, 35 F.Supp.2d at 343. By way of example, a monthly average of 48.96% of all applicants were diverted from seeking assistance at the Jamaica Job Center. *Id.* Figures for other job centers were equally alarming. Other evidence confirmed what might be fairly characterized as a culture of improper deterrence at job centers, including summary reports prepared by job centers tracking the number of applicants diverted. *Id.* at 344–45.

Plaintiffs also presented evidence that job centers were failing to comply with

---

**1.** While the federal government reimburses the states for the full value of the food stamp benefits distributed, it pays only part of a state's administrative expenses associated with that distribution. *See* 7 U.S.C. § 2025(a).

certain statutory and regulatory requirements for administering food stamps and Medicaid benefits. For example, the evidence indicated that job centers were failing to timely process applications, failing to separate eligibility determinations, erroneously denying food stamps and Medicaid applications, failing to allow individuals to apply for benefits on their first visit to a job center, and failing to provide adequate notice of determinations. *See Reynolds I,* 35 F.Supp.2d at 345–47.

Based on these findings, the Court granted plaintiffs' application for a preliminary injunction and directed the City defendants to:

- allow plaintiffs and all persons applying for food stamps, Medicaid and cash assistance, including expedited food stamps and temporary pre-investigation grants to apply for such benefits on the first day that they visit a Job Center;

- process all applications for expedited food stamps and temporary pre-investigation grants at Job Centers within the time frames required by law;

- make eligibility determinations regarding food stamps and Medicaid applications at Job Centers separate from the eligibility determinations regarding cash assistance applications; and

- send plaintiffs and all persons applying for food stamps, Medicaid and cash assistance, including expedited food stamps and temporary pre-investigation grants at Job Centers timely and adequate written notice of determinations of their eligibility for all benefits which they seek.

*Reynolds I,* 35 F.Supp.2d at 347–48. The Court enjoined the City defendants from opening new job centers and from converting existing income support centers to job

centers, pending a hearing and determination on the adequacy of a corrective plan addressing remedial training and procedures for job center personnel. At a minimum, the corrective action plan was to address the following issues:

- Procedures to permit applicants to file an application for food stamps, Medicaid or cash assistance on the first day of contact with a Job Center;

- Procedures for separate determinations on an applicant's request for food stamps, Medicaid and cash assistance;

- Procedures for processing applications for expedited food stamps within seven days from the date the application is submitted;

- Procedures for processing applications for pre-investigation immediate needs cash assistance in a manner consistent with State law;

- Procedures for processing applications for food stamps and/or Medicaid where applicants fail to comply with work requirements; [and]

- Procedures for providing written notice to applicants denied food stamps, Medicaid and/or cash assistance together with the basis for those denials and an opportunity to request a fair hearing.

*Reynolds I,* 35 F.Supp.2d at 348.[2] The Court was (and remains) sensitive to intruding on HRA's ability to freely exercise its managerial prerogatives and to implement policy, but nevertheless observed:

In its quest to enhance the delivery of food stamps, Medicaid and cash assistance benefits to the City's most needy residents, the City cannot lose sight of the requirements imposed by federal statutes and regulations. Because some of the City's neediest residents continue to fall through the safety net at job

---

**2.** The Court also continued a previously ordered informal intervention process under which individual cases could receive expedit-

ed review. *See Reynolds I,* 35 F.Supp.2d at 348.

centers, this Court is impelled to ensure that remedial steps are taken on a specified time-line and that the effects of the revisions to job center procedures are measured to ascertain whether they are working.

*Reynolds I,* 35 F.Supp.2d at 341.

Thereafter, the City defendants set out to formulate a comprehensive corrective action plan and to retrain its front-line personnel at job centers and income support centers. After a series of revisions that were shaped in part by plaintiffs' suggestions and criticisms, the City defendants submitted a proposed corrective action plan and moved for an order lifting the stay on job center conversions.

On May 24, 1999, this Court approved the corrective action plan and modified the preliminary injunction to allow the City defendants to convert three more income support centers to job centers. *See Reynolds II,* 43 F.Supp.2d at 492. The Court declined to permit additional job center conversions because the City defendants' proof was inconclusive as to whether its corrective action plan and other remedial measures were having salutary effects at job centers.

At that time, FIA had audited its job centers and income support centers for the months of January and February 1999 in an effort to monitor their performance in a number of critical areas. While the City defendants argued that the audit data demonstrated improved accuracy in processing applications at job centers, plaintiffs drew contrary conclusions from the same data set and raised doubts about the reliability of FIA's audit procedures. *See Reynolds II,* 43 F.Supp.2d at 498. Those issues could not be resolved on the record as it existed at that time. The Court observed: "The disparities between the parties' calculations underscores the need for reliable, uniform audit procedures and statistically valid monitoring protocols. While data may always be subject to differing interpretations, the parties cannot

even agree on the validity of the data set." *Reynolds II,* 43 F.Supp.2d at 498.

Accordingly, this Court ruled that it would consider a further modification of the preliminary injunction "after a hearing and determination on the adequacy of the City defendants' auditing procedures for job centers and an analysis of the data collected pursuant to those procedures." *Reynolds II,* 43 F.Supp.2d at 498. The City defendants were invited to amend or supplement their audit procedures, or to demonstrate that their existing procedures were reliable and valid. *Id.* In either event, the Court envisioned that additional data for the months of March, April, and May 1999 would be available for analysis so that it could be more fully informed "as to whether the reforms contemplated by the corrective action plan are translating into practice." *Id.*

Following *Reynolds II,* the parties engaged in additional discovery as the City defendants prepared to bring on a further application to modify the preliminary injunction. An evidentiary hearing was scheduled by this Court for July 26, 1999. On the eve of that hearing, after voluminous submissions had been filed with the Court, the City defendants requested that the hearing be adjourned. During a telephone conference conducted on July 26, 1999, the City conceded that it was not prepared to defend the reliability of their existing audit procedures. By order dated July 26, 1999, this Court denied the City defendants' motion to modify the preliminary injunction without prejudice to its renewal upon further application to the Court.

The City defendants balked at that time because they apparently recognized that the results of the audits conducted by FIA in anticipation of the hearing were materially flawed. One of the principal criticisms leveled by plaintiff's expert was that FIA sampling protocol—which involved manually selecting cases from batches of application control cards that are maintained at job and income support centers—generat-

ed a hopelessly biased sample in which accepted cases were over-represented. (Faust 1st Rpt. ¶ 59; Faust 2d Rpt. ¶ 19)

During the months of August and September 1999, the City defendants conducted another audit of applications filed in May, June and July 1999 using a newly-designed audit instrument (the "Reynolds Audit"). Although plaintiffs suggested to the City defendants that their respective experts collaborate on the design of the new audit instrument, their overture was rejected.

On September 22, 1999, this Court conducted a status conference at which the City defendants indicated their intention to renew their motion to dissolve the preliminary injunction. Since plaintiffs had not participated in designing the Reynolds Audit, they sought time to conduct discovery. The Court acceded to the City defendants' request for a prompt hearing date and established tentative dates for the expeditious completion fact and expert discovery. During a further pretrial conference conducted on October 21, 1999, those tentative dates hardened into firm deadlines, and an evidentiary hearing was scheduled for December 15 and 16, 1999.

The hearing proceeded on December 15 and 16, 1999. A third and final day of testimony was taken on January 19, 2000, and thereafter the parties submitted post-hearing memoranda of law and proposed findings of fact. On March 2, 2000, the Court heard oral argument on the City defendants' motion. By order dated May 18, 2000, the Court directed plaintiffs and the State defendants to submit additional memoranda of law concerning the State defendants' motion to dismiss plaintiffs' claims as against them.

During the evidentiary hearing, the City defendants presented testimony from Patricia M. Smith, Executive Deputy Director for FIA; Jacqueline Flaumm, Assistant Deputy Commissioner for FIA;

Rochelle L. Abdullah, Director of OQA; Andrew Bush, Executive Deputy Administrator of HRA's Office Policy and Program Analysis ("OPPA"); Meyer Elbaz, HRA's Assistant Deputy Administrator for Management Information Systems; and Dr. June E. O'Neill, an expert in statistical sampling and the use and interpretation of data. Plaintiffs' sole witness was their statistician, Richard Faust.

In addition to this testimony, the parties made extensive pre-hearing submissions. Notably, the City defendants offered a final version of their expert report, dated October 12, 1999. (City Ex. 1) The analyses contained in this final version of Dr. O'Neill's report included additional case files that were located and audited during the final weeks of the Reynolds Audit. Dr. O'Neill also submitted a lengthy supplemental declaration, dated January 7, 2000, containing a host of new tables and revised calculations. Plaintiffs' expert submitted two reports in connection with the Reynolds Audit, the first dated December 6, 1999 ("Faust 2d Rpt."), and the second dated January 17, 2000 ("Faust 3d Rpt.").[3] Plaintiffs' January 17, 2000 expert report addressed the matters raised in Dr. O'Neill's supplemental declaration of January 7, 2000.

## Discussion

### I. The City Defendants' Motion To Vacate The Preliminary Injunction

The purpose of the evidentiary hearing was to determine whether the corrective action plan approved in Reynolds II had translated into practice. The City defendants pointed to an array of initiatives and other items of proof in an effort to show that it had. Principally, the City defendants rely on the results of the Reynolds Audit in which HRA personnel audited 1,893 case files drawn from job centers and income support centers.

---

**3.** The first report submitted by plaintiffs' expert addressed the City defendants' audit for the hearing that had been scheduled for July 26, 1999.

The City defendants also contend that HRA has improved its other monitoring and oversight activities. In January 1999, OQA implemented Process Evaluation and Review Team ("PERT") audits, in which a pair of FIA auditors conduct a week-long inspection and review of the operations at a particular job center. The City defendants also highlight OQA's "QC [Quality Control] Doctor" program, in which several OQA personnel make repeated visits to a particular center to focus on and resolve particular problems. In addition, shortly after the preliminary injunction issued in *Reynolds I*, FIA began sending "spot-checkers" to job and income support centers. The spot-checkers posed as applicants in order to determine whether individuals were permitted to file for benefits on their first day of contact with a center. Apart from these oversight activities by HRA, centers are also subject to reviews by the New York State Office of Temporary and Disability Assistance ("OTDA"), as well as the United States Department of Agriculture ("USDA").

Additional monitoring activities have been undertaken in connection with this litigation. Pursuant to this Court's order entered on April 5, 1999, plaintiffs' counsel has been permitted to conduct one-day inspections of up to five job centers each month during discovery. The particular center to be inspected on any given day is identified by plaintiffs' counsel 48 hours in advance. In addition, the parties have utilized an "informal intervention" procedure in which plaintiffs' counsel may call HRA's attention to particular cases of exigent need for expedited food stamps and/or emergency cash assistance.

Finally, the City defendants have begun using the results of "fair hearing" appeals of agency determinations as a monitoring device for job center and income support center performance. By comparing HRA's "win rates" for appeals taken from both job center and income support center eligibility determinations, the City defendants conclude that job centers generally perform better.

Based on these efforts and the Reynolds Audit, the City defendants argue that there is no longer a basis for maintaining the preliminary injunction. (City Defs.' Post–Hearing Mem. at 2) Before turning to the merits of the City defendants' motion, the Court addresses the parties' divergent views as to the standard governing the City's application.

### A. *The Applicable Standard*

■ This Court set out the applicable standard for modifying a preliminary injunction in *Reynolds II*. On such motions, "a court is charged with exercising the same discretion it exercised in granting or denying the injunction in the first instance." *Reynolds II*, 43 F.Supp.2d at 494 (citing *Sierra Club v. United States Army Corps of Engineers*, 732 F.2d 253, 256 (2d Cir.1984)). "An injunction is an ambulatory remedy that marches along according to the nature of the proceeding. It is executory and subject to adaption as events may shape the need, except where rights are fully accrued or facts are so nearly permanent as to be substantially impervious to change." *Sierra Club*, 732 F.2d at 256.

Though both plaintiffs and the City defendants would accept this general standard as controlling, they join issue as to how it should be applied. At the outset, the Court observes that the City defendants' motion seeks to vacate all portions of this Court's January 25, 1999 preliminary injunction, including both the stay on job center conversions and those decretal paragraphs ordering that applications for food stamps, Medicaid and cash assistance be processed in conformity with applicable statutory mandates.[4] Focusing on these

---

4. The City defendants' notice of motion, dated December 10, 1999, states in relevant part: "[T]he Corrective Action Plan approved by this Court on May 24, 1999, has been effective in improving and continuing to improve the circumstances that gave rise to the action, so that there is no longer any justification for continued judicial restrictions on defendants'

two aspects of the order, the City defendants contend that there is no longer a factual or legal basis for continuing the injunction.

Specifically, the City defendants argue that plaintiffs failed to prove during the evidentiary hearing that job center personnel continue to deter individuals from applying for benefits. The City defendants further contend that the Reynolds Audit demonstrated that job centers perform at least as well, and often better than, income support centers. Thus, as to job center conversions, the City defendants claim that the conditions that may have warranted preliminary injunctive relief in *Reynolds I* have abated, and they argue that plaintiffs have offered no evidentiary basis for its continuance.

With respect to that branch of the preliminary injunction requiring HRA to comply with federal and state law, the City defendants assert that any errors in processing applications at job centers are isolated occurrences. Relying again on the results of the Reynolds Audit, the City defendants further claim that HRA is in "substantial compliance" with applicable statutory and regulatory requirements. Consequently, the City defendants argue that the balance of the preliminary injunction should be vacated because plaintiffs cannot establish a municipal "policy or custom" pursuant to *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[5]

Plaintiffs attack the City defendants' characterization of the parties' respective burdens of proof at this juncture in the proceedings, and they dispute the applicability of *Monell's* policy or custom requirement. Plaintiffs argue that since their class-action complaint seeks only prospective injunctive relief, *Monell* is inapplicable. Plaintiffs also argue that even if *Monell* applied, the proof in *Reynolds I* established the requisite policy or custom, and the City defendants have not met their burden of showing compliance with applicable laws or cessation of improper deterrence at job centers. Since it is a threshold issue that really underlies both of the aforementioned branches of the preliminary injunction, the Court turns first to the City defendants' arguments concerning the relevancy of *Monell.*

There is scant and conflicting authority as to whether *Monell* applies in actions where the only remedy demanded is prospective injunctive and declaratory relief. However, those courts which have squarely addressed the issue have concluded that it does not. The Ninth Circuit's decision in *Chaloux v. Killeen*, 886 F.2d 247 (9th Cir.1989), is a leading example. In *Chaloux*, the plaintiffs were recipients of social security disability benefits who challenged the constitutionality of Idaho's statutory scheme of post-judgment execution and garnishment procedures. Their class action complaint alleged that the statute violated their due process rights and ran afoul of the Supremacy Clause because it permitted seizure of their federally exempt disability benefits. *See Chaloux*, 886 F.2d at 248–49. The plaintiffs invoked 42 U.S.C. § 1983 and sought prospective declaratory and injunctive relief. *Id.* at 250.

On appeal from the district court's order dismissing the complaint, the Ninth Circuit considered whether *Monell's* official policy or custom requirement was applicable to claims against the defendant county sheriffs named in their official capacities. The court ruled that this requirement did not apply to "a suit for prospective relief against a county or its officials for enforcing allegedly unconstitutional state laws."

conduct. Accordingly, City Defendants respectfully request that the preliminary injunction be vacated."

**5.** The State defendants' similarly argue that plaintiffs' complaint does not plead a valid Section 1983 claim because it does not adequately allege a State policy or custom. *See infra,* Part III.

*Chaloux,* 886 F.2d at 250. The court explained:

> We reach this conclusion upon review of the policy justifications supporting the decision in *Monell.* The *Monell* Court set forth an "official policy or custom" requirement to limit § 1983 damage awards against municipalities. That limitation served to alleviate the imposition of financial liability on local governments based solely on a respondeat superior theory.
>
> . . . .
>
> We find no persuasive reasons for applying the Court's "official policy or custom" requirement to suits against counties only for prospective relief. The justification for limiting an action for damages is notably absent when the relief sought is an injunction halting the enforcement of an unconstitutional state statutory scheme. The relief sought here, a declaration that the Idaho statutes are unconstitutional and an injunction against their enforcement, do not carry any threat of fiscal liability.

*Chaloux,* 886 F.2d at 250–51 (citations and footnotes omitted); *accord Los Angeles Police Protective League v. Gates,* 995 F.2d 1469, 1472 (9th Cir.1993) ("[T]he City can be subject to prospective injunctive relief even if the constitutional violation was not the result of an official custom or policy.") (internal quotation marks omitted); *Nobby Lobby, Inc. v. City of Dallas,* 767 F.Supp. 801, 810 (N.D.Tex.1991) ("The Court can find in the case law no reason to impose an official policy or custom requirement in a situation where prospective relief alone is at issue and there is no threat of municipal financial liability.") (internal quotation marks omitted), *aff'd on other grounds,* 970 F.2d 82 (5th Cir.1992); *Santiago v. Miles,* 774 F.Supp. 775, 792–93 (W.D.N.Y.1991) (in action for prospective injunctive relief against State officials pursuant to *Ex parte Young,* plaintiffs were not required to prove that defendants acted pursuant to a policy or custom).

Several courts have applied *Monell's* policy or custom requirement in actions involving only prospective injunctive relief, but did so without analysis. *See Bannum, Inc. v. City of Fort Lauderdale,* 901 F.2d 989, 997 (11th Cir.1990); *Salazar v. District of Columbia,* 954 F.Supp. 278, 324 (D.D.C.1996); *United States v. Commonwealth of Pennsylvania,* 902 F.Supp. 565, 580, 649 (W.D.Pa.1995), *aff'd,* 96 F.3d 1436 (3d Cir.1996). Other cases cited by the City defendants are distinguishable in that they involved claims for both damages and injunctive relief, *see, e.g., Barrett v. Harwood,* 189 F.3d 297, 300, 303 (2d Cir.1999); *Adkins v. Board of Educ. of Magoffin County, Ky.,* 982 F.2d 952, 957–59 (6th Cir.1993); *Nix v. Norman,* 879 F.2d 429, 433 (8th Cir.1989), or for retroactive declaratory relief, *see Community Health Care Association of New York v. DeParle,* 69 F.Supp.2d 463, 471–72, 474–75 (S.D.N.Y.1999); *see generally Green v. Mansour,* 474 U.S. 64, 73, 106 S.Ct. 423, 428, 88 L.Ed.2d 371 (1985).

Notwithstanding the paucity of case law supporting the City's position, its arguments are not without merit. Plaintiffs in this action seek broad-based, system-wide injunctive relief. Such relief would necessarily have some impact on the City's expenditure of public funds, thereby undercutting the rationale of *Chaloux* and its progeny. Viewed through a different lens, the relief plaintiffs seek would only require the City to comply with applicable federal requirements, something it is already bound to do. *See generally Rothstein v. Wyman,* 467 F.2d 226, 232 (2d Cir.1972). This Court, however, need not decide whether the City's argument concerning *Monell*—raised now for the first time—is correct.[6] Whether or not *Monell* requires

---

6. In this Court's view, the surface appeal of the City defendants' argument that proof of a policy or custom is required in a case involving institutional reform lies not with their expansive reading of *Monell,* but rather with the well-established limitations on a federal court's authority to decree structural relief. *See, e.g., Dayton Board of Educ. v. Brinkman,*

plaintiffs in this action to plead and prove a policy or custom, the evidence adduced in *Reynolds I, see supra,* was indicative of a widespread pattern of violations that would be actionable under *Monell. See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388–89, 109 S.Ct. 1197, 1204–05, 103 L.Ed.2d 412 (1989); *Walker v. City of New York,* 974 F.2d 293, 297–98 (2d Cir.1992); *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983); *Turpin v. Mailet,* 619 F.2d 196, 200 (2d Cir.1980).

■ Accordingly, to obtain the relief they seek, the City defendants must show that the conditions warranting preliminary injunctive relief in *Reynolds I* have been remedied through their successful implementation of the corrective action plan or have otherwise abated. Plaintiffs, having met their burden in *Reynolds I* of establishing a risk of irreparable harm based on the City defendants' failure to comply with federal law, are not required to re-prove their case for preliminary injunctive relief. The question for the Court is whether circumstances have changed, particularly since *Reynolds II* when the Court approved the City's corrective action plan, such that continuation of the preliminary injunction is no longer warranted. The burden of establishing such changed circumstances rests squarely on the City defendants. The Court will not presume that the City's corrective action plan has succeeded simply because it had all the right ingredients; the proof of the pudding is in the eating.

433 U.S. 406, 420, 97 S.Ct. 2766, 2774, 2775, 53 L.Ed.2d 851 (1977) ("[O]nly if there has been a systemwide impact may there be a systemwide remedy."); *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). Here, the scope of preliminary injunctive relief entered against the City defendants in *Reynolds I* reflected the nature of plaintiffs' class-based claims and the strength of the evidence supporting those claims.

7. Citations to "O'Neill Rpt." are references to Dr. O'Neill's second amended report, dated October 18, 1999, submitted by the City defendants.

With these precepts in mind, the Court turns to the City defendants' motion.

### B. *The Reynolds Audit*

### 1. *Overview of the Sampling Process and the Audit Instrument*

The City defendants' describe the Reynolds Audit as a "massive undertaking" (City Defs.' Post–Hearing Mem. at 10), a characterization plaintiffs do not dispute. The City defendants embarked on this effort immediately after informing the Court on July 26, 1999 that it was unprepared to defend its existing audit procedures.

First, the City defendants designed a series of protocols for selecting a random sample of cases from among the applications submitted at job centers and income support centers in May, June and July 1999. After drawing the sample, the City utilized a new audit instrument to review the sampled case files and measure performance in the following areas: "(a) providing immediate needs cash assistance where appropriate; (b) providing expedited food stamp service where appropriate; (c) timely providing immediate needs and expedited food stamps; and (d) making separate determinations or referrals for food stamps or Medicaid where cash assistance was denied or the application was withdrawn." (O'Neill Rpt. ¶ 9) [7] Additionally, the instrument sought to determine whether a notice of benefit determination was issued to an applicant.

In order to select its random [8] sample of case files, the City defendants initially de-

8. Technically, the City defendants' sampling protocol was designed to select a "systematic" rather than a "random" sample. *Compare* O'Neill Rpt. ¶ 14 ("I assisted the City in designing a sample selection protocol that would generate a random but stratified sample of applicants ...."), *and* Tr/O'Neill/78 ("Do you understand that in fact the sampling protocol you designed for the [Reynolds] audit would more correctly be described as a systematic sampling protocol? A: Yes, exactly right."). In a systematic sampling, only the initial sampling unit is randomly selected; thereafter, every $n$ th unit is drawn within a

cided to utilize HRA's "NYCWAY" computerized database. HRA maintains over 100 different computer databases. (Elbaz Decl. ¶ 3) It uses the NYCWAY system to track appointments made for public assistance applicants in education, training and work programs. (Dep/Elbaz/154–55) Thus, the NYCWAY system focuses primarily on public assistance recipients rather than on applicants. (Elbaz Decl. ¶ 6)

Information for the NYCWAY system is electronically transmitted from the State of New York Welfare Management System ("WMS"), a state-operated computer system used to maintain information on applicants for certain benefits, including food stamps, Medicaid and cash assistance. NYCWAY receives updated information from the WMS system every night so it is available to case workers the following morning. (Dep/Elbaz/63–64) The primary focus of the WMS system is on active public assistance recipients who have completed the application process, though it contains limited information regarding applicants for food stamps, Medicaid and cash assistance. (Elbaz Decl. ¶ 5)

On or about August 5, 1999, the City defendants drew a sample of cases from the NYCWAY database. This was done with a computer program designed to select cases from job centers and income support centers in proportion to the number of applicants at each center. (O'Neill Rpt. ¶¶ 14, 16) The City defendants originally intended to include approximately 2,100 cases in the Reynolds Audit, consisting of an average of 25 cases per month for each center, with a minimum of 20 cases selected at any given center. (O'Neill Rpt. ¶ 14 and Ex. B)

However, as HRA auditors began to review the sampled case files, they discovered that the NYCWAY data set was over-inclusive. For example, it contained applications by persons with AIDS under the "DASIS" (Division of Aids Services and Income Support) program. (O'Neill Rpt. ¶ 16) Additionally, HRA realized that the

NYCWAY data set was under-inclusive because it replaced old information about applicants with any new information. (Dep/Elbaz/52) Once old information is over-written on the NYCWAY system, it cannot be retrieved. For example, if an applicant files more than one application, the newest application automatically purges any information about all earlier applications. (Dep/Elbaz/55–56)

These shortcomings led the City defendants to draw a second sample from a different database known as the Eligibility Verification Review ("EVR") information system. Like the NYCWAY system, the EVR database receives applicant-specific information from the state-run WMS system. (Dep/Elbaz/66) The EVR computer system is oriented around the eligibility verification review process, wherein the information and supporting documentation provided by applicants is screened for accuracy. (Elbaz Decl. ¶ 8) Once an EVR appointment is scheduled, the system tracks the applicant through the application process. In contrast to the NYCWAY system, the EVR system does not over-write data, so every filing of an application is preserved. (Dep/Elbaz/87, 97, 174)

The second sample of cases was drawn from the EVR database on or about August 11, 1999. (O'Neill Rpt. ¶ 17) At that time, however, HRA auditors had already begun reviewing case files for May 1999 from the NYCWAY sample. Rather than start anew, the City defendants decided that for cases filed in May 1999, it would rely primarily on the NYCWAY sample and would draw additional cases from the EVR database only when a sufficient number of NYCWAY-selected case files could not be physically located and retrieved from the centers. (O'Neill Rpt. ¶ 17) However, since the EVR database was superior because it more closely "approximated the target group" (O'Neill Rpt. ¶ 17) of applicants, the City defendants made it the primary database when it drew sam-

predetermined interval. (Faust 2d Rpt. ¶¶ 21, 27)

ples for the months of June and July 1999; for those months, the NYCWAY database was used as a supplement.

Once the primary and secondary samples were drawn, the case files were physically delivered to a central location at HRA headquarters. (O'Neill Rpt. ¶ 20) There, the files were audited by OQA staff members. Of the ten auditors involved, some had prior experience in conducting such reviews while others did not. (Dep/Mortley/11; Dep/Ricks/13) The auditors used a newly-designed audit instrument that presented a series of questions in two stages. (O'Neill Rpt., City Ex. A)

Stage one of the audit instrument contained several categories of questions focusing on whether applications were properly screened and processed for, *inter alia,* immediate needs cash and/or expedited food stamps eligibility. Stage two confined its questions to cases where an application was rejected ("RJ") or "single/issue closed" ("SI/CL") The SI/CL category refers to applicants who actually received emergency cash assistance or expedited food stamps.

After the auditors finished their review, the case files and completed audit instruments were given a second-level review by selected staff members from job centers and income support centers. (Abdullah Decl. ¶ 22; Flaum Decl. ¶ 9) Thereafter, a third-level review was conducted by regional managers or their deputies. (Flaum Decl. ¶ 17)

### 2. *Applicable Standards*

The City defendants do not dispute that they bear the burden of demonstrating that Reynolds Audit was conducted in conformity with generally accepted survey principles. When a sample is drawn for the purpose of generating data about a population to be offered for its truth, as the Reynolds Audit is being offered here, "[t]he methods used must conform to generally recognized statistical standards." Manual for Complex Litigation, § 21.493 (3d ed.1997). Relevant factors include whether:

- the population was properly chosen and defined;
- the sample chosen was representative of that population;
- the data gathered was accurately reported; and
- the data was analyzed in accordance with accepted statistical principles.[9]

Manual for Complex Litigation, § 21.493. *See generally Schering Corp. v. Pfizer Inc.,* 189 F.3d 218, 224–26 (2d Cir.1999).

Both parties' experts subscribe to the view that the representativeness of the sample is the primary concern of any researcher because without it, one cannot reliably project from the sample to the population. *See* Moore's Federal Practice, Reference Manual on Scientific Evidence, at 237 (Matthew Bender 1997) ("Identification of a survey population must be followed by selection of a sample that accurately represents that population."); *accord Pittsburgh Press Club v. United States,* 579 F.2d 751, 758 (3d Cir. 1978); *Rosado v. Wyman,* 322 F.Supp. 1173, 1181–82 (E.D.N.Y.1970), *aff'd,* 437 F.2d 619 (2d Cir.1970), *aff'd,* 402 U.S. 991, 91 S.Ct. 2169, 29 L.Ed.2d 157 (1971). Representativeness can usually be assured when the source(s) from which the sample is drawn (*i.e.,* the "sampling frame") accurately reflects the target population. *See* Moore's Federal Practice, Reference Manual on Scientific Evidence, at 235. In addition, the sampling protocol

---

**9.** In some contexts, it becomes necessary to distinguish between surveys conducted for the purpose of generating objective data to be offered for its truth, and sampling in order to gauge opinions, attitudes and beliefs held by a population. Surveys of the latter type, which are prevalent in trademark and false advertis-

ing cases, *see Schering,* 189 F.3d at 225, may be subject to additional scrutiny, especially with respect to how the survey questions were framed and presented. However, the four factors listed above establish benchmarks for assessing the reliability of any survey, irrespective of its methodology and objectives.

should be designed so that every element in the sampled population has a known, nonzero probability of being selected. *Id.* at 237. *See also American Home Products Corp. v. Barr Laboratories, Inc.,* 656 F.Supp. 1058, 1070 (D.N.J.1987), *aff'd,* 834 F.2d 368 (3d Cir.1987); *Dreyfus Fund, Inc. v. Royal Bank of Canada,* 525 F.Supp. 1108, 1116 (S.D.N.Y.1981); *Handbook of Recommended Procedures for the Trial of Protracted Cases,* 25 F.R.D. 351, 429 (Judicial Conf.1960); Kevin H. Smith, *External Validity: Representativeness and Projectability in the Probative Value of Sample Surveys,* 39 Wayne L.Rev. 1433, 1484–87 (1993).

■ Nevertheless, even where a survey is found to suffer from technical or methodological flaws, it may still be received in evidence subject to arguments about its weight and probative value. *See Schering,* 189 F.3d at 228; *Bacardi & Co. Ltd. v. New York Lighter Co., Inc.,* 2000 WL 298915, at *5 (E.D.N.Y. Mar. 15, 2000) (97 Civ. 7140(JS)). For example, where a sampling frame is under-inclusive, "the survey's value depends on the extent to which the excluded population is likely to react differently from the included population." Reference Manual on Scientific Evidence, at 236; *accord Champion v. Shalala,* 33 F.3d 963, 966–67 (8th Cir.1994). Similarly, criticisms that a sampling protocol was not random or otherwise reliable, *see, e.g., Debra P. v. Turlington,* 730 F.2d 1405, 1408, 1411 n. 11 (11th Cir.1984), or resulted in a high non-response rate, *see, e.g., Champion,* 33 F.3d at 967, will not render a survey inadmissable. Rather, such shortcomings will undermine a survey's reliability and erode its probative value. Of course, a combination of technical flaws or a single, fundamental defect may eviscerate the evidentiary force of a survey. *See, e.g., Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 746 F.2d 112, 118 (2d Cir.1984).

Plaintiffs take the view that the Reynold Audit is fundamentally flawed in so many areas that it cannot be used to draw any reliable conclusions about the performance of job centers and income support centers. First, plaintiffs argue that the sampling frame for the Reynolds Audit, *i.e.,* the NYCWAY and EVR computer databases, is under-inclusive of the population of applicants because it does not include applications that were withdrawn or rejected on the same day they were filed. Consequently, plaintiffs contend that the sampling frame is unrepresentative of the population. In addition, plaintiffs argue that the Reynolds Audit sample of 1,893 cases is not sufficiently representative of the NYCWAY and EVR databases from which it was drawn. Further, plaintiffs claim that an inordinately high number of cases could not be located and retrieved from centers or were erroneously excluded from the auditing process. Finally, plaintiffs contend that the two-stage audit instrument used to conduct the Reynolds Audit was poorly designed and failed to include necessary questions. The Court addresses these issues seriatim.

### 3. The Absence of Certain Withdrawn and Rejected Cases From the Sampling Frame

According to plaintiffs, the greatest fault with the Reynolds Audit is that its sampling frame excluded virtually all cases in which an application was withdrawn on the same day it was submitted. (Faust 2d Rpt. ¶¶ 29, 48–80) In fact, only 12 of the 1,893 cases in the Reynolds Audit sample are withdrawn cases. Relatedly, plaintiffs contend that an unknown number of cases rejected on the same day they were submitted are absent from the sampling frame, though plaintiffs acknowledge that this may present a lesser problem since the sample includes a substantial number of rejected cases. The City defendants do not dispute that the NYCWAY and EVR databases generally do not capture instances where an application is filed and withdrawn on the same day. (Bush Decl. ¶¶ 3–4) They argue, however, that the absence of withdrawn cases is largely im-

material because they do not impact the principal issues being audited and therefore could not have biased the survey results. (City Post–Hearing Mem. at B–3) As for rejected cases, the City defendants appear to dispute that any significant number of rejected cases were improperly excluded.

Before turning to the merits of these arguments, the Court addresses several preliminary points. First, the Reynolds Audit was apparently intended to include withdrawn cases, even though it failed to do so. In that regard, page one of the audit instrument required auditors to indicate the disposition of the application being reviewed. One of the six check boxes provided on the audit instrument was for "WD" (withdrawn) applications.[10] Further, the City defendants' expert report observed that "[t]he instrument was designed to capture Job Center and Income Support Center performance in ... (d) making separate determinations or referrals for Food Stamps or Medicaid where cash assistance was denied *or the application was withdrawn*." O'Neill 2d Rpt. ¶ 9 (emphasis added).

Nevertheless, the expert reports submitted by the City defendants in advance of the evidentiary hearing failed to account for the absence of withdrawn cases from the NYCWAY and EVR databases. By way of illustration, Table I of the City defendants' expert report (City Ex. 1) provided statistical breakdowns of dispositions for the job center and income support center samples, as well as comparative data on dispositions from the NYCWAY and EVR databases. The table lists only five of the six disposition categories: application pending, single-issue, acceptance, rejected, and single-issue closed. Withdrawn cases are not mentioned, even though the 12 cases that were included in the Reynolds Audit constituted 0.8% of the job center sample and 0.5% of the income

support center sample. (Faust 2d Rpt. ¶ 60) .

The City defendants claim that they decided to draw audit samples from the NYCWAY and EVR databases, knowing that they might be under-inclusive or otherwise imperfect, because HRA does not maintain a computer database capable of tracking applications that are withdrawn on the same day they are filed. *See* Smith Supp. Dec. ¶ 8 ("[T]here is no computer database that contains *all* incidents of applications filed at the Centers.") (emphasis in original). Further, the City defendants hoped to avoid the pitfalls they experienced in connection with the aborted July 26, 1999 hearing where the audit samples were drawn manually using control cards. (Bush Decl. ¶¶ 4–5; Dep/Smith/20–23) Ultimately, the City defendants concluded that "the databases [were] the best available approximation of the universe of applicants," (Smith Decl. ¶ 19), and that auditing withdrawn cases would not have yielded additional useful information.

In the Court's view, the Hobson's Choice depicted by the City defendants was self-imposed. It is noteworthy that despite the City defendants' acknowledgment on July 26, 1999 that their existing audit results were fundamentally flawed, HRA personnel were drawing cases from the NYCWAY database less than two weeks later. While courts rarely find fault with a litigant who proceeds with alacrity, in this case the City defendants' hastily-conceived sampling protocol spawned an array of complex statistical issues that might have been avoided.

The City defendants acknowledge that "some of the peculiarities of the computer databases selected were not fully evident until the [ ] Reynolds audit was complete[.]" (Smith Decl. ¶ 19) *See also* O'Neill Rpt. ¶ 19 (referring to the "significant time constraints [the City defendants] faced in completing the audit."); Tr/O'Neill/86 ("Q: But, Dr. O'Neill, it was

---

10. The other checks boxes are "AP" (application pending), "SI" (single-issue), "AC" (acceptance), "RJ" (rejected) and "SI/CL" (single-issue, closed).

your earlier testimony, wasn't it, just a few minutes ago, that you in fact knew that withdrawn cases are purged at the time you prepared this report? Isn't that correct? A: I said that I believed that I was conscious of something like that. Honestly, it was not something that I had focused on. It was something that was always a kind of fuzzy area."); Dep/Elbaz/86–87 ("Q: Do you know why, on approximately August 11, a sample was selected from a second data set?" "... A: A lot of this happened very quickly because of the pressure that I was under to produce something right away."). Against this backdrop, the City defendants' reasons for relying exclusively on the NYCWAY and EVR databases for the Reynolds Audit have the earmarks of *post hoc* rationalization.

This is most evident in Dr. O'Neill's second supplemental declaration, dated January 7, 2000, in which she discusses for the first time various statistical approaches for testing and compensating for over- and under-representativeness in samples. Dr. O'Neill's second supplemental declaration—which easily surpasses her main expert report in length and complexity—was precipitated by matters raised by plaintiffs during the portion of the evidentiary hearing conducted in December 1999. Plaintiffs, in turn, responded with a third expert report challenging the appropriateness of the corrective techniques employed by Dr. O'Neill as well as the results of her analyses. Such successive rounds of increasingly complex submissions would have been obviated had the City defendants taken the

time to inform themselves of the "peculiarities" of the databases on which they chose to rely.[11]

Turning to the merits, it is useful to briefly explore why certain withdrawn and rejected cases may have been excluded from the sampling frame. New applications are initially entered into the State-run WMS database, which then transmits relevant information to the NYCWAY and EVR databases overnight on a daily basis. (Dep/Elbaz/63–67) However, applications withdrawn on the same day they are filed are automatically purged from the WMS system before a record of those applications is transferred to the NYCWAY or EVR databases. (Dep/Elbaz/194–97; Dep/Parker/110) On the other hand, if an EVR appointment is made for an applicant before his case is withdrawn, then the EVR system records (and preserves) the application without regard to the nightly WMS data transfer. Thus, there are only two ways in which a withdrawn application could enter the NYCWAY or EVR databases: (1) the application is not withdrawn on the WMS system on the same day it is entered into that system, in which case it will be transferred to the NYCWAY and EVR systems overnight; or (2) an EVR appointment is scheduled for an applicant before his application is withdrawn, in which case the EVR system will preserve a record of the application. (Faust 2d Rpt. ¶¶ 72, 73).[12]

Applications which are rejected on the same day they are filed may also be excluded from the NYCWAY and EVR databases, though the record is considerably

---

11. Plaintiffs' expert testified that the NYCWAY database was a poor choice, and that the shortcomings of the EVR system should have been addressed—either by reprogramming or by some other means—before HRA committed its resources. (Tr/Faust/70) Although the City defendants claimed that its EVR database was the best available option, and that manual control cards are not uniformly maintained at all centers, plaintiffs' expert responded persuasively:

If you want to do a valuable audit, you have to have reliable data somewhere. It has to

be in the computer or it has to be in the manual records. Otherwise you can't do a reliable audit.

Tr/Faust/70.

12. Of the twelve withdrawn cases in the Reynolds Audit sample, seven had a computer-generated EVR appointment form in their case file and three were withdrawn some time after the date of application. (Jeffrey Decl. ¶¶ 28–29) Of the remaining two cases, one file was not located and the other contained insufficient information. (*Id.* at ¶ 26)

murkier as to how and when that might occur. (Dep/Elbaz/190–93 (opining that the answers to such questions lie within a labyrinth of computer programming code)) Ultimately, plaintiffs were unable to do more than speculate as to the number of rejected cases, if any, that may have been excluded. (Faust 2d Rpt. ¶ 29; Faust 3d Rpt. ¶ 41; Tr/Faust/367, 371–73) For that reason, the Court will focus instead on withdrawn cases and how their relative absence from the sample may have skewed the audit results. Nevertheless, the possibility that even a small number of rejected cases were inadvertently excluded from the sample raises concerns. According to the City defendants' own calculations, over the three-month audit period rejected cases exhibited significantly higher rates of inappropriate denials of immediate needs cash grants than accepted cases (39.4%—47.9% for rejected cases versus 8.8%—14.7% for accepted cases). (O'Neill Sec. Supp. Decl., Tbl. 11; Tr/O'Neill/481) Inappropriate denials of expedited food stamp applications were also much more prevalent among rejected cases than accepted cases (30.8%—41.0% versus 13.8%—19.8%). (*Id.* at Tbl. 15) Thus, the use of a database which may have excluded a segment of rejected cases could be a source of error.[13] The City defendants' expert report does not address the potential impact of purging rejected cases from the sampling frame. (Tr/O'Neill/100)

As mentioned earlier, only 12 withdrawn cases appear in the Reynolds Audit.

Those cases constitute just 0.8% of the job center audit sample, a figure that plaintiffs demonstrated is grossly under-inclusive of the true population of withdrawn cases.

Plaintiffs performed tabulations of the true population of withdrawn cases based on two different sources. One set of population disposition data was derived from Job Center Applicant Reports prepared by HRA's Office Policy and Program Analysis ("OPPA"). A second set of tabulations was done by counting the number of withdrawn cases appearing on the Daily Activity Logs maintained by job centers. (Jeffrey Decl. ¶ 5)[14] Tabulations from the OPPA reports indicate that for the three-month audit period, 27.8% of those persons categorized as seeking assistance did not continue their application past the financial planning interview. (Jeffrey Decl. ¶ 7) Plaintiffs' review of the Daily Activity Logs indicated that 17.5% of those seeking assistance withdrew their applications at or before the financial planning interview. (*Id.* at ¶ 14)[15] These two figures of 17.5% and 27.8% are an upper and lower estimate of the true number of withdrawn applications at job centers.[16]

Plaintiffs' expert performed a binomial test of statistical significance, for all categories of disposition, on the percentages generated by the Reynolds Audit sample and the OPPA reports. Plaintiffs' expert similarly compared the percentage of withdrawn cases in the audit sample with the

13. Another shadowy issue is the effect, if any, of the NYCWAY database automatically over-writing old data, thereby obliterating instances of multiple applications. It may be reasonable to infer that applicants who filed more than one application experienced difficulties with their initial applications. (Faust 2d Rpt. ¶ 78) However, the Court cannot draw any conclusions about this potential source of bias because the City defendants did not investigate it.

14. Tabulations could not be performed for income support centers for lack of comparable data sources.

15. Because of inconsistencies in the way Daily Activity Logs are utilized at different job

centers, plaintiffs were unable to decipher notations made in the logs at six job centers. Consequently, plaintiffs' tabulations do not include those centers.

16. Responding to arguments advanced by the City, plaintiffs' expert recalculated the OPPA report tabulations of withdrawn cases as percentages of (1) persons seeking cash assistance, and (2) persons seen by a financial planner. (Faust 3d Rpt. ¶¶ 23–27) His results for the three-month audit period, 26.0% and 18.8%, respectively, are not materially different than the figures in the Jeffrey declaration.

Daily Activity Log tabulations. The respective percentages may be summarized as follows:

| Disposition Status | | Audit Sample | OPPA Rpts | Activity Logs |
|---|---|---|---|---|
| AP | (pending) | 3.0 | 3 | – |
| SI | (single issue) | 6.1 | 4 | – |
| AC | (accepted) | 46.6 | 28 | – |
| RJ | (rejected) | 19.5 | 18 | – |
| SI/CL | (SI closed) | 24.1 | 20 | – |
| WD | (withdrawn) | 0.8 | 28 | 17 |

For the AP (pending), SI (single issue), RJ (rejected) and SI/CL (single issue/closed) categories of disposition, there is little disparity between the sample and population figures, and the differences are not statistically significant. (Faust 2d Rpt. ¶ 64) However, for AC (accepted) cases and WD (withdrawn) cases, the differences (46.6% versus 28%, and 0.8% versus 17%–28%, respectively) are statistically significant beyond the 0.001 level. A finding that a disparity is statistically significant "at the 0.001 level" means that the chance is less than one in a thousand that the disparity occurred by chance. (Tr/Faust/286)[17]

As mentioned at the outset, the City defendants do not dispute that withdrawn cases were largely excluded from the Reynolds Audit sample. Rather, they argue that plaintiffs failed to demonstrate that the absence of withdrawn cases could have biased the audit results in favor of job centers. The City defendants further claim that withdrawn cases implicate, at most, only one of the several issues being audited. (City Defs.' Post–Hearing Response Mem. at 17; O'Neill Sec. Supp. Decl. ¶ 5) This Court disagrees.

The failure to capture withdrawn cases in the audit sample necessarily biases the results by over-representing the other dispositions, particularly accepted cases. (Faust 2d Rpt. ¶ 80) As indicated above, accepted cases have significantly lower rates of inappropriate denials for immediate needs cash grants and for expedited food stamps than rejected cases. For immediate needs cash grants, the difference in inappropriate denials is 8.8%—14.7% for accepted cases versus 39.4%—47.9% for rejected cases. For expedited food stamps, the figures are 13.8%—19.8% versus 30.8%—41.0%. Plaintiffs argue that inappropriate denials may well be more prevalent in withdrawn cases than accepted cases, and would likely occur more frequently in job centers given their more rigorous application process. Indeed, given this Court's previous finding that job centers were improperly deterring individuals from submitting applications, *see Reynolds I*, 35 F.Supp.2d at 343, the absence of withdrawn cases raises serious concerns that the audit results are biased in favor of job centers.

This concern is heightened by evidence presented by plaintiffs suggesting that some applicants are still improperly deterred from filing applications. The Daily Activity Logs from seven job centers contain handwritten entries suggesting that applicants withdrew their applications for assistance based on inaccurate information concerning eligibility criteria. (Jeffrey Supp. Decl., App. I) Some of the reasons listed for withdrawals, *e.g.*, missing documents, applicant being under 21 years of age, or appearing at the job center without a spouse, echo problems discussed in *Reynolds I*. *See Reynolds I*, 35 F.Supp.2d at 344–45.

17. For a more detailed discussion of statistical tests and levels of significance, *see infra,* section I.B.4.

It may be, as HRA Executive Deputy Director Patricia M. Smith asserted in her supplemental declaration dated January 7, 2000, that job center staff are simply noting legitimate issues of ineligibility in the Daily Activity Logs. (Smith Supp. Decl. ¶ 22) [18] The City defendants argue that "it is not enough to simply look at the very brief annotations in the Job Center daily logs and conclude that unlawful diversion is occurring." (City Defs.' Post–Hearing Mem. at 12) That too, may be true, and the Court does not view the Daily Activity Logs as conclusive proof of unlawful diversion. However, the Court found such practices of unlawful diversion existed in *Reynolds I;* it is the City defendants' burden on this motion to demonstrate that their corrective action plan and other remedial measures have put an end to those practices. At a minimum, the Daily Activity Logs raise doubts about whether unlawful deterrence continues to occur at job centers, and they compound the danger of having withdrawn cases essentially unrepresented in the audit sample. The City defendants have not adequately investigated and resolved these questions.

Similarly, the City defendants failed to adequately support their theory that withdrawn cases are only relevant for examining issues of separate Medicaid and food stamps eligibility determinations. Applicants who withdraw applications for cash assistance but continue their applications for food stamps and Medicaid must be screened for eligibility for expedited food stamps; they are also entitled to notice of their eligibility for ongoing food stamps and Medicaid. (*Compare* Tr/Smith/22–26 *with* Tr/O'Neill/489–91) In fact, of the twelve withdrawn cases in the audit sample, seven were reviewed by auditors for whether a correct determination of eligibility for expedited food stamps had been made. OQA's auditors found that in one of

those instances, benefits had been wrongly denied. (Tr/Faust/417–18) One of the twelve withdrawn cases was evaluated for whether a correct determination of eligibility for an immediate needs grant had been made. In that case, the determination was correct. *Id.* While the City defendants suggest that such partial withdrawals are uncommon, (City Defs.' Post–Hearing Mem. at B–4), they offer no concrete proof to substantiate that assertion. In sum, the Court finds that the absence of withdrawn cases from the audit sample significantly undermines the reliability of the audit results.

*4. The Sample Is Statistically Unrepresentative Of The NYCWAY And EVR Computer Databases From Which It Was Drawn*

The City defendants do not dispute that the Reynolds Audit sample is unrepresentative of the NYCWAY and EVR computer populations from which it was drawn. Instead, the City argues that the deviations between the sample and these populations are not large enough "to seriously influence the results of the audit" and that "for all practical purposes the audit sample provides a reliable representation of the population from which it is drawn." (O'Neill Rpt. ¶ 27) The Court disagrees that the statistical deviations at issue are small enough to be treated lightly, and it declines the City's invitation to take a leap of faith and presume that these deviations did not bias the sample results.

The City defendants' expert elected to perform chi-square tests of representativeness of the audit sample to the computer populations. In this context, the chi-square test measures the extent to which the audit sample was drawn from the computer database population through a random, and therefore reliable, selection process. [19] The chi-square calculation results

---

18. It should be noted that in October 1999, HRA relieved job centers of the obligation to maintain Daily Activity Logs.

19. *See generally NAACP v. City of Mansfield, Ohio,* 866 F.2d 162, 167 (6th Cir.1989) ("A chi-square value is a test of association which measures deviations from expected behavior.

in a number that may be compared to a table of "critical values" for different levels of significance. (Pls.' Ex. 112) Level of significance is a measure of the probability that an outcome occurred randomly. If the chi-square result exceeds the critical value listed at a certain level of significance, then the disparity may be attributable to non-random sampling error. A level of significance at the ".05 level" corresponds to two "standard deviations," while a level of significance at the ".001 level" corresponds to three "standard deviations." "Social scientists consider a finding of two standard deviations significant, meaning there is about one chance in 20 that the explanation for a deviation could be random and the deviation must be accounted for by some factor other than chance." *Waisome v. Port Auth.*, 948 F.2d 1370, 1376 (2d Cir.1991). A finding that a disparity is statistically significant at the .001 level means that the probability is less than one in a thousand that the disparity occurred by chance.

Using the chi-square test to compare disposition status (*i.e.*, accepted, rejected, closed, etc.) between the sample and the computer database population, the City defendants' expert concluded that the differences were "somewhat larger than we would expect if pure sampling error were the only source of divergence (a Chi-square test)." (O'Neill Rpt. ¶ 27) In other words, the sample failed the chi-square test. Plaintiffs' expert replicated the chi-

square test comparing sample dispositions with the computer database population and found that the results did not pass the test at any level of significance. (Pls.' Ex. 109)[20] In fact, he characterized the results as "way off the chart." (Tr/Faust/287)[21]

One possible source of non-sampling error may be the use of two separate computer database populations, *i.e.*, NYCWAY and EVR. The EVR database contains approximately 7,000 more cases than the NYCWAY database, principally because the EVR system preserves multiple applications, whereas the NYCWAY system overwrites data and only includes the most recent application on file. (Elbaz Decl. ¶¶ 19–20)[22] Plaintiffs identified a number of significant differences in application dispositions between these computer populations. (Faust 2d Rpt. ¶¶ 99–100; Tbl. E) Another source of non-sampling error may be the fact that many case files could not be located and retrieved from the centers, thus requiring the City defendants to rely heavily on "supplemental" cases selected from the NYCWAY database.[23]

Although the City defendants performed additional tests of representativeness (*e.g.*, comparing the audit sample with only the EVR database on the characteristic of household composition, and comparing disposition status after weighting the sample results), problems persisted. With respect to household composition (*i.e.*, the number of adults and children in the applicant

---

Certain deviations are expected to occur as a pattern of chance. However, at some point a discrepancy becomes so large that it is no longer expected to occur as a result of chance alone.").

**20.** Plaintiffs performed the chi-square test for the preliminary audit sample of 1,720 cases and the final sample of 1,893 cases. The chi-square critical value at the .0001 level of significance, four degrees of freedom, is 18.464. The chi-square value comparing the job center sample to the NYCWAY and EVR databases is 147.89 and 34.27, respectively. For the income support center sample, the corresponding figures are 136.06 and 27.61. (Pls.' Ex. 109; Tr/Faust/287–88)

**21.** The City defendants mischaracterize Mr. Faust's testimony concerning the so-called "10% rule of thumb." (City Defs.' Post–Hearing Mem. at B-7). Mr. Faust explained that this rule applies to non-response data, not to statistical disparities. (Tr/Faust/424–26; Faust 3d Rpt. ¶ 8)

**22.** The City defendants' expert report failed to mention this disparity. (Tr/O'Neill/94–96)

**23.** This latter issue is addressed below in section I.B.5.

household), plaintiffs' expert found the differences between the sample and database population to be statistically significant beyond the .001 level. (Faust 3d Rpt. ¶ 20) [24] The City defendants' use of statistical weighting to compensate for discrepancies in the sample and population distributions raises additional doubts. For example, the absence of withdrawn cases cannot be corrected by weighting because there are only 12 of them in the audit sample. (Faust 3d Rpt. ¶¶ 64–66) As plaintiffs' expert explained:

A: ... If you have a certain category that has missing cases, for instance, and you have some cases from that category in your sample, then you can weight it to correct for the cases that are missing. If you have no cases from that category in your sample, then you can't correct for it by weighting.

Q: And that would be the withdrawn cases[?]

A: Yes. In other words, in my opinion, the withdrawn cases are supposed to be 19 to 26 percent of all the job center cases. Now, there are only 12 cases, withdrawn cases, in the sample. And there's no way you could weight that up to be more than the population. But, for instance, if you had a good proportion of withdrawn cases and you had reason to believe—but you should investigate this—you had reason to believe that the withdrawn cases you have are similar to the withdrawn cases you don't have, then you can weight them to account for the withdrawn cases you don't have.

(Tr/Faust/399–400)

Unable to refute the statistical tests showing that the audit sample is unrepresentative of the databases from which it was drawn, the City defendants accuse plaintiffs of utilizing "an unrealistic standard of statistical purity," (City Defs. Response Mem. at 11), and claim that the sample is representative enough to be deemed reliable. These arguments are unpersuasive.

This Court recognizes that "in deciding whether a sample is adequate, practical limits to fact finding precision must be considered." *Rosado*, 322 F.Supp. at 1181. However, both the chi-square and binomial tests of statistical significance are recognized by courts as being valid means of assessing the representativeness of a sample. *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 496 n. 17, 97 S.Ct. 1272, 1281 n. 17, 51 L.Ed.2d 498 (1977); *Board of Educ. of City School Dist. of City of New York v. Califano*, 584 F.2d 576, 585 n. 29 (2nd Cir.1978), *aff'd*, 444 U.S. 130, 100 S.Ct. 363, 62 L.Ed.2d 275 (1979); *Jones v. New York City Human Resources Admin.*, 391 F.Supp. 1064, 1071 (S.D.N.Y.1975), *aff'd*, 528 F.2d 696 (2d Cir.1976). The sample consistently failed these tests of reliability, often by wide margins. The Court is unwilling to accept the City's *ipse dixit* that the sample is nonetheless reliable, particularly since its expert is unable to quantify its reliability or cite other factors which might offset the chi-square results and provide some guarantees of trustworthi-

---

24. Plaintiffs' expert performed a further chi-square test on what he believed to be a more appropriate comparison: sample cases from the EVR database versus the EVR database. This time, the differences in household composition were statistically significant at the .02 level. (Faust 3d Rpt. ¶ 21)

In contrast, the City defendants' expert statistician conceded that she never performed a chi-square test on her household composition comparison (O'Neill Supp. Decl. Tbl. 19) before presenting it to the Court. (Tr/O'Neill/488) Instead, the City defendants' expert described the relevant distributions as "quite close," thereby "leading to the conclusion that the sample is more representative of the universe than one might conclude looking solely at disposition status." (O'Neill Supp. Decl. ¶ 42)

ness.[25]

The Court concludes that the sample could not have been drawn from the population of applicants in the NYCWAY and EVR databases by a valid process because the disparities between the sample and the data set are statistically significant. The sample's failure to pass generally accepted tests of statistical reliability further erodes confidence in the audit results.

### 5. The Sample's Non–Retrieval Rate Is Significant And Constitutes Another Source Of Potential Error

The Reynolds Audit was originally intended to include approximately 1,800 cases selected from a single database (an average of 25 cases per month per center, with a minimum of 20 cases per center, for three months). (O'Neill Rpt. Ex. B at 3) The City decided to use two different databases after discovering drawbacks in the NYCWAY database. Thus, the City defendants generated two lists of cases to be retrieved and audited for the Reynolds Audit. The primary list was drawn from the NYCWAY database for May 1999 and from the EVR database for June and July 1999. The supplemental list was drawn from the EVR database in May 1999 and from the NYCWAY database in June and July 1999. Using the two databases, the City defendants' selection protocol required that "if more than 10% of a center's primary sample for a month can *not* be audited (due either to missing files, missing information in the files provided, or a case being inappropriate for audit), all

cases from the supplemental sample for that month are requested from the center." (O'Neill Rpt. Ex. B at 4)

In practice, the City defendants experienced great difficulty retrieving the prescribed number of case files from centers and, in fact, were forced to tap the supplemental list every month for every center. (Faust 3d Rpt. ¶ 44); (Jeffrey Decl. Tbl. 4) Plaintiffs' tabulations indicated that the City sought to retrieve a total of 3,933 cases from job and income support centers. (Pls.' Exs. 7–12) Of these 3,933 case files, 1,299 (or 33%) were not retrieved for auditing. (Faust 2d Rpt. ¶ 103, Ex. F) Even using two samples, 8 of the 28 centers (29%) were unable to find a minimum of 60 cases over the three-month audit period. (Faust 3d Rpt. Ex. A) Four of those eight centers were job centers. The City defendants' expert acknowledged that "[s]ome of the centers had very poor responses. A few of them had quite low samples.... I know that it is generally true that there were a few centers that fell far short of their sample targets." (Tr/O'Neill/127)

The City defendants also failed to audit a large number of cases where records were retrieved. Of the 2,634 (3,933 minus 1,299) case files retrieved as part of the Reynolds Audit, only 1,893 were audited, leaving 741 cases (or 28%) found but not audited. The City defendants argued that of these 741 cases, "some 600" (City Defs.' Post–Hearing Mem. at B–10) were properly excluded for various reasons,[26] but they

---

**25.** It is noteworthy that the City defendants' expert statistician never informed the Court of the extent to which the sample is unrepresentative of the NYCWAY and EVR databases based on the chi-square test. (*Compare* Tr/O'Neill/55 ("In general one could not say that they are totally different. They are really fairly close. They don't make it statistically, but nonetheless they are reasonably close.") *with* Tr/Faust/287) ("It is obviously much, much higher.... Even the figures for EVR are off the chart. But the NYCWAY figures are way off the chart.")

Another detail the City defendants' expert avoided was that HRA recently awarded a

$2.7 million grant to the Center for the Study of Business and Government at Baruch College, where she is the director. The purpose of the grant is to assist HRA to better understand the impact of implementing job centers and to examine methods for improving center management and performance. (Tr/O'Neill/479)

**26.** For example, the City defendants excluded DASIS cases and cases on remand from fair hearings because they did not present the application issues being audited. (City Defs.' Post–Hearing Mem. at B–10)

specifically identified only 338 such cases. (Pls.' Ex. 13) The City defendants do not and presumably cannot account for the balance of 403 cases that were excluded.

It also appears that the City defendants failed to audit a significant number of cases based on "insufficient documentation," (Pls.' Ex. 13) where the files did, in fact, contain enough information to be audited. (Pls.' Exs. 21–36; Jeffrey Decl. ¶ 39) The only document whose absence would disable auditors from reviewing a case is the application, *i.e.,* the Applicant Job Profile ("AJP"). (Dep/Mortley/57–58; Dep/Plummer/66; Dep/Ricks/60) Plaintiffs reviewed 169 of the cases not audited due to missing information and found that 12% of those case files contained an AJP for the relevant audit month. (Jeffrey Decl. ¶ 39)

The City defendants' expert failed to examine why so many cases were not retrieved from the centers, or whether their absence could have biased the audit results. Plaintiffs' expert, on the other hand, studied the significance of these missing cases and found a positive correlation between the percentage of unaudited cases and poor-performing centers. (Faust 3d Rpt. ¶¶ 47–56; Tr/Faust/437–38) Plaintiffs' expert also determined that late arriving cases were more likely to have a higher proportion of rejected cases, which in turn exhibited higher percentages of inappropriate denials of immediate needs grants and expedited food stamps. (Faust 3d Rpt. ¶¶ 69–73) The Court finds these analyses to be credible. It is fair to infer that unaudited cases would have been relatively poor performers, and that their absence from the Reynolds Audit is a significant source of potential error.

Unable to offer analyses of their own, the City defendants contend that the non-retrieval rate for the Reynolds Audit is comparable to non-response rates obtained in other surveys, such as the Current Population Survey ("CPS") conducted monthly by the Bureau of Labor Statistics and the Bureau of the Census. The Court rejects this analogy. According to Dr. O'Neill, the CPS has a survey non-respondent rate of 6.5% and, with respect to missing answers on questionnaires, a non-response rate near 10%. (O'Neill Decl. ¶ 13) Here, while the non-retrieval rate for the Reynolds Audit is difficult to ascertain with precision (largely because the City defendants prepared vague and incomplete tabulations), it is well above 10% by any conservative estimate.

The Court also rejects the City defendants' assertion that correlations found by plaintiffs' expert can be neutralized through statistical weighting. (City Defs.' Post–Hearing Mem. at B–13) As plaintiffs' expert explained, weighting is viable only where the characteristics of the missing cases are known. (Tr/Faust/400) ("[Y]ou see, that's the trouble. You don't know what the . . . performance is in the missing cases. There's nothing in the sample you can weight for them.") The City defendants would presume that unaudited cases perform as well as audited cases, when in fact the only evidence on this issue indicates that their performance is worse.

### 6. The Audit Instrument and Procedures Were Flawed

Plaintiffs' expert characterized the Reynolds Audit instrument as "one of the most poorly designed instruments I have ever seen out of a professional organization which has research and auditing personnel on staff." (Faust 2d Rpt. ¶ 131) The Court finds most of plaintiffs' criticisms of the instrument to be material and well-founded. In particular, the Court agrees that the audit instrument omitted relevant questions, (Pls.' Rev. Proposed Findings of Fact and Conclusions of Law, ¶¶ 97, 98, 99, 101, 102); was confusing and incomplete in certain respects, (*id.* at ¶ 104, 106, 107, 108, 110); and should have been accompanied by written instructions for auditors, (*id.* at ¶ 113; Faust 2d Rpt. ¶ 156). The City defendants' own auditors experienced some difficulty understanding and using the instrument in a consistent

manner. (Dep/Plummer/33 ("We found a lot of grey areas with the instrument that we used in August."); Dep/Plummer/39–40; Dep/Mortley/78–79; Dep/Ricks/74–75; Dep/Abdullah/82–83)

### 7. Conclusion: The Results Of The Reynolds Audit Are Entitled To Only Minimal Weight

■ The foregoing deficiencies with the Reynolds Audit do not constitute the entirety of plaintiffs' objections. However, they are sufficient, when considered together, to vitiate the probative value of the audit results. The City defendants make several resourceful arguments touting the reliability of the audit results, asserting that job centers perform better than income support centers, and claiming that job center performance has improved over time. While those arguments have some surface appeal, they do not withstand close scrutiny.

For example, the City defendants asserted that even if some number of rejected cases are excluded from the NYCWAY and EVR databases, there is no reason to believe that their absence would bias the audit results in favor of job centers. According to the City, the Reynolds Audit established that job centers generally outperform income support centers (O'Neill 2d Supp. Decl., Tbls. 12 and 16), and adding more rejected cases to the sample would not close that disparity. (City Post Hearing Mem. at B–5, n. 2)

The problem with this argument (and similar ones advanced by the City defendants) is its reliance on a faulty premise: that the audit results are fundamentally reliable, and therefore provide a steady framework upon which such inferences may be drawn. That is not the case. Plaintiffs did far more than establish that the audit results are merely imprecise. The consequences of, *inter alia*, excluding withdrawn cases from the sampling frame do not manifest themselves by distorting an isolated figure by a percentage point or two. They are problems which render the Reynolds Audit statistically unrepresentative of the universe of applications and frustrate any responsible effort to project from the sample to the universe. In short, given the array of unanswered questions left in the wake of the Reynolds Audit, it is difficult to trust any of the extrapolations made by the City defendants comparing the performance of job and income support centers, or assessing the performance of job centers over time. It is safe to conclude only that the centers' true performance figures are probably much different than those presented by the City defendants.

Having failed to independently investigate the sources of error identified by plaintiffs, the City defendants resort to arguing that the evidence fails to show an actual bias in favor of job centers. Thus, the City defendants highlight the fact that plaintiffs' expert offered no opinion as to whether job center performance has improved over time, how they compare with income support centers, or whether the corrective action plan is being successfully implemented. (City Defs.' Post–Hearing Mem. at 12; Tr/Faust/355–56) The City argues that these uncertainties reveal gaps in plaintiffs' case. In fact, the opposite is true. The City defendants, as the proponents of the audit, bear the burden of assuring that the results lack statistical bias. In this Court's view, they have not done so. Once plaintiffs had thoroughly undermined the structural underpinnings of the Reynolds Audit, they were not required to identify the direction in which it would topple. Nevertheless, at least with respect to the absence of withdrawn cases, plaintiffs convinced this Court that the deck was stacked in favor of job centers.

Accordingly, the Court turns to the other items of proof put forth by the City defendants in support of their motion to vacate the preliminary injunction.

### C. Spot–Checkers, PERT Audits and Other Monitoring Devices

Shortly after the preliminary injunction issued in January 1999, FIA implemented

a program of sending spot-checkers to job centers and income support centers. Spot-checkers make unannounced, anonymous visits to centers where they describe their (fictitious) needs and ask for an application. The spot-checkers then report back on their experiences to FIA. Where a spot-checker is not permitted to file an application on the day of their visit, or is treated in an unprofessional manner, FIA takes corrective action. (Smith Decl. ¶¶ 10–11; Flaum Decl. ¶¶ 20–40; Walton Decl. ¶¶ 4–18) The summaries of spot-checker reports offered by the City defendants show a downward trend in applicants being turned away from job centers and income support centers since January 1999. (City Defs. Exs. 18, 19)

In the Court's view, the spot-check program is a useful, albeit limited, management tool for FIA. Spot-checkers do not ascertain whether their applications will actually be accepted for processing, and whether they will have the opportunity to meet with a financial planner. Once they receive an application from a center, they leave. (Dep/Walton/48–49) The program's effectiveness has also been tempered by the failure of spot-checkers to adequately vary the scenario they present when requesting an application. (Dep/Walton/21–22) When this was finally done in August and September 1999 by having the spot-checkers claim to be aliens, it caused a modest rise in the rate of inappropriate denials of the right to obtain an application. (City Defs.' Ex. 18)

In addition to the spot-checker program, which FIA intends to continue indefinitely, the City defendants point to the results of "fair hearing" appeals of agency determinations as another monitoring device evidencing superior job center performance. These appeals are conducted by an administrative law judge employed by the New York Office of Temporary and Disability Assistance ("OTDA"). (Dworkin Decl. ¶ 2) Since April 1999, the City defendants have used data generated by OTDA concerning the results of those hearings to tabulate "win rates" for job centers and income support centers. (Dworkin Decl. ¶¶ 14–17; Dep/Dworkin/18)

According to the City defendants, the respective win rates for job and income support centers for application-related issues may be summarized as follows:

### CITY DEFENDANTS' WIN-RATE CALCULATION

| | Apr–99 | May–99 | Jun–99 | Jul–99 |
|---|---|---|---|---|
| Job Centers | 68.8% | 77.2% | 79.1% | 85.9% |
| IS Centers | 84.3% | 75.5% | 80.3% | 84.9% |

(City Defs.' Exs. 10, 11) These figures hardly support the City defendants' assertion that job center determinations fare better than income support center determinations on appeal.

Moreover, the figures themselves are somewhat illusory because FIA excludes from its calculation instances where the administrative law judge has remanded a case for insufficient information. (Dworkin Decl. ¶ 28) If remands are factored back into the equation, and the City's win rate is calculated by dividing total wins (affirmances, defaults, appellant withdrawals and dismissals for lack of jurisdiction[27]) by total appeals (affirmances, defaults, appellant withdrawals, dismissals, agency withdrawals, reversals and remands), the figures recalculate as follows:

### RECALCULATED WIN-RATE (with remands counted as losses)

| | May–99 | Jun–99 | Jul–99 |
|---|---|---|---|
| Job Centers | 50.0% | 49.8% | 58.0% |
| IS Centers | 49.0% | 56.0% | 58.1[28] |

27. This disposition is listed as "other" in the "issues won" section of the fair hearing outcome summaries. (City Defs.' Ex. 10)

28. Percentages are not provided for April 1999 because the underlying data summaries for that month were not provided in City Defs.' Exs. 10 and 11.

If the win rate is calculated, as plaintiffs suggest, on the basis of hearings held, and appellant defaults and jurisdictional dismissals are not counted as wins for the City, then the figures plunge further:

RECALCULATED WIN–RATE (on the basis of hearings held where a decision on the merits is rendered)

| | May–99 | Jun–99 | Jul–99 |
|---|---|---|---|
| Job Centers | 29.6% | 32.9% | 36.7% |
| IS Centers | 33.5% | 34.1% | 33.5% |

(Pls.' Mem. at 40, Tbl. 5) The Court recognizes that the recalculated figures are imprecise. FIA does not investigate remands or appellant withdrawals, so the data only permits rough generalizations about such dispositions. However, the reworked percentages provide a better indicator of the centers' appellate win rate.

The City defendants also contend that other oversight activities and initiatives for self-correction have improved and intensified. When the preliminary injunction issued in January 1999, OQA had just begun sending its newly established PERT teams into job and income support centers to conduct on-site performance reviews. Among other things, the PERT teams observe center operations and audit cases files. (Smith Decl. ¶ 13; Abdullah Decl. ¶ 10) OQA's other on-site review program, QC Doctor, is designed to identify and correct problems at individual centers through retraining and other initiatives. (Smith Decl. ¶ 14; Abdullah Decl. ¶ 9)

Centers are also subject to ongoing federal and state performance reviews for compliance with food stamp program procedures. In that regard, State defendant Wing and the OTDA conducted "Food Stamp Program Access Reviews" at nine job centers between July 1999 and October 1999. (Pls.' Exs. 72–81) Among the more serious problems identified by the State reviewers were untimely or incorrect determinations of expedited food stamps eligibility, failure to make separate eligibility determinations, and failure to provide necessary notices. (Jeffrey Supp. Decl. ¶¶ 58–62) The centers also had trouble retrieving case files; they located and produced only 178 of the 288 files requested for review. (Jeffrey Supp. Decl. ¶¶ 55–56) The City defendants, seeing this glass as half-full, emphasize that the OTDA has approved HRA's center-specific corrective action plans formulated in response to the access reviews. (Smith Supp. Decl. ¶ 23; City Defs.' Ex. 36)

Finally, the City defendants point out that job center operations have been under scrutiny within the context of this litigation, notably through the job center inspections conducted by plaintiffs' counsel and the informal intervention process. The City defendants claim that neither of these mechanisms have produced evidence indicative of systemic violations of federal and state law attributable to job center conversions. Plaintiffs dispute this characterization of the proof and allege, for example, that of the 225 applicants they interviewed during job center inspections, 61 reported probable violations of law. (Landeo Decl. ¶¶ 3–6; City Defs.' Post–Hearing Mem. at 9)

These are nettlesome but ultimately collateral disputes which the Court need not untangle. To the extent that the City defendants are correct that the evidence concerning job center inspections and informal intervention establishes only "that HRA workers make mistakes and that applicants do not always receive the treatment they deserve" (City Defs.' Post–Hearing Mem. at 9), then this proof provides the City little assistance in meeting its burden of demonstrating a significant change in circumstances since this Court entered the preliminary injunction in January 1999.

D. *The City Defendants' Motion To Vacate The Preliminary Injunction Is Denied*

In *Reynolds II,* the Court modified the preliminary injunction by permitting HRA

to convert three additional job centers based largely on the City defendants' formulation of a comprehensive corrective action plan which entailed, among other things, retraining several thousand personnel at job centers and income support centers. The Court struck a balance and allowed those conversions to proceed, but at the same time underscored the need for reliable, uniform audit procedures and statistically valid monitoring protocols. "In such a complex system, the translation of theory into practice presents unique challenges in terms of training HRA personnel and measuring the effectiveness of the Plan's initiatives." *Reynolds II*, 43 F.Supp.2d at 497.

■ At this juncture, the City defendants are unable to proffer reliable statistical evidence of job center and income support center performance because the results of the Reynolds Audit cannot be trusted.[29] While the City defendants continue to utilize a number of other tools designed to monitor and improve the centers' performance (*e.g.*, spot checking and fair hearing results), those devices shed little light on whether the centers are complying with federal requirements. In short, the Court can find no principled basis for vacating or otherwise modifying the preliminary injunction at this time.

## II. *The State Defendants' Motion To Dismiss The Complaint*

In response to plaintiffs' application for preliminary injunctive relief, the State defendants moved to dismiss the complaint as against them for failure to state a claim. At the close of the January 1999 hearing, plaintiffs' counsel conceded that preliminary injunctive relief directed against the State defendants would be premature. *See Reynolds I*, 35 F.Supp.2d at 340 n. 7. Consequently, no preliminary relief was

entered against the State defendants, and the Court deferred reaching the ·merits of the State's motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6). Thereafter, as a matter of case management, the Court channeled the parties' discovery efforts towards the City defendants' operation and management of the centers.

The State defendants move to dismiss each of plaintiffs' claims against them under Rule 12(b)(6) on the following grounds: (1) the State defendants are protected by Eleventh Amendment immunity; (2) plaintiffs have no cognizable private right of action for violations of the Food Stamp Act, Medicaid Act, and New York State cash assistance programs; (3) plaintiffs failed to exhaust their administrative remedies; and (4) plaintiffs fail to allege facts against the State defendants upon which relief can be granted. For the reasons set forth below, the State defendants' motion is denied.

### A. *Applicable Standard*

In resolving a motion to dismiss, the pleadings and affidavits must be construed in favor of the plaintiff, and all doubts should be resolved in the plaintiff's favor and against the defendants. *See Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998); *Cohen v. Koenig*, 25 F.3d 1168, 1171–72 (2d Cir.1994). A complaint may not be dismissed under Rule 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565, 572 (S.D.N.Y.1999) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)). The issue is not whether the Plaintiff will ultimately prevail but whether they are entitled to offer evidence in support of their claims. *See Black Radio*, 44 F.Supp.2d at 572.

---

29. It therefore is unnecessary for the Court to decide now the precise level of compliance required under the Food Stamps and Medicaid Acts. *Compare Shands v. Tull*, 602 F.2d 1156, 1160 (3d Cir.1979) (endorsing a standard of "substantial compliance"), *with Withrow v. Concannon*, 942 F.2d 1385, 1388 (9th Cir.1991) (observing that "the regulations require compliance, not 'substantial compliance.' ").

## B. *Eleventh Amendment Immunity*

■ The State defendants contend that plaintiffs' claims against them are barred by the Eleventh Amendment to the United States Constitution. The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. An unconsenting State is thus immune from suits in federal court brought by its own citizens, *see Edelman v. Jordan*, 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974), and such immunity extends to State agencies and officers acting on behalf of the State. *See Puerto Rico Aqueduct and Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144–47, 113 S.Ct. 684, 687–89, 121 L.Ed.2d 605 (1993).

■ The Supreme Court, however, has recognized an exception to State immunity: "a suit challenging the constitutionality of a state official's action is not one against the state." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 102, 104 S.Ct. 900, 909, 79 L.Ed.2d 67 (1984) (citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908)); *accord Burnette v. Carothers*, 192 F.3d 52, 57 n. 3 (2d Cir.1999). In *Ex Parte Young*, the Court held that Eleventh Amendment immunity does not shield State officials acting in violation of federal law. In those circumstances, the officials' unauthorized actions are stripped of their official character and may be challenged in a federal suit. *See Ex Parte Young*, 209 U.S. at 160, 28 S.Ct. at 454; *accord Pennhurst*, 465 U.S. at 102, 104

S.Ct. at 909. The doctrine of *Ex Parte Young* applies to violations of the United States Constitution as well as federal statutes, *see Kostok v. Thomas*, 105 F.3d 65, 68 (2d Cir.1997), and permits a plaintiff to seek prospective injunctive relief to prevent continued violations. *See Pennhurst*, 465 U.S. at 102–03, 104 S.Ct. at 909 (citing *Edelman*, 415 U.S. at 666–67, 94 S.Ct. at 1357–58) ("[W]hen a plaintiff sues a state official alleging violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief."); *Ward v. Thomas*, 207 F.3d 114, 119 (2d Cir.2000) ("[T]he Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law.") (quoting *Green v. Mansour*, 474 U.S. 64, 68, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985)).

■ Plaintiffs' claims against the State defendants fall squarely within the *Ex Parte Young* exception. *See Reynolds I*, 35 F.Supp.2d at 340 n. 8 ("the Court observes that official-capacity actions seeking prospective injunctive relief for alleged violations of federal law are not treated as actions against the State."). Plaintiffs have named state officials, not the state itself, as defendants. (Compl. ¶¶ 16–19) Plaintiffs allege that the state officials are violating and continue to violate federal laws, including the Fourteenth Amendment to the Constitution, the Food Stamp Act, 7 U.S.C. § 2020 *et seq.*, and the Medicaid Act, 42 U.S.C. § 1396.[30] (Compl. ¶¶ 255–61, 263–66) Plaintiffs seek prospective injunctive relief, and not retroactive money damages, against the State defendants.[31] *See Roberson v. Giuliani*,

---

**30.** The State defendants contend, and plaintiffs deny, that plaintiffs have sued them for violations of State law. *See* State Defs.' Supp. Mem. at 21–23; Pls.' Supp. Mem. at 28 n.16. Although the complaint appears to plead State law claims only against the City defendants, *see* Compl. ¶ 262, to the extent that plaintiffs' requested relief is premised on the State defendants' violations of State law, *see*

Compl. Relief for Request ¶¶ b. (viii), e. (i), such relief is barred by the Eleventh Amendment. *See Pennhurst*, 465 U.S. at 104–06, 104 S.Ct. at 910–11.

**31.** However, this Court reserves decision on whether, if such an issue arises, the State defendants are immune from a claim for retroactive money damages to the extent the

2000 WL 760300, at *9–10 (S.D.N.Y. Jun. 12, 2000) (99 Civ. 10900(DLC)) (denying State officials' motion to dismiss claims for prospective injunctive relief for violations of the Food Stamp Act); *Graus v. Kaladjian*, 2 F.Supp.2d 540, 542 (S.D.N.Y.1998) (denying State defendant's motion to dismiss claims for prospective injunctive relief for violations of the Medicaid Act).

Relying on *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at 908, and *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 75 n. 17, 116 S.Ct. 1114, 1133 n. 17, 134 L.Ed.2d 252 (1996), the State defendants assert that the *Ex Parte Young* doctrine is inapplicable. This argument is unpersuasive.

The State defendants contend that since defendants Wing and DeBuono do not single-handedly oversee and supervise the State's food stamp and Medicaid programs, respectively, this action is barred under *Pennhurst* because the "the state is the real, substantial party in interest." (State Defs.' Supp. Mem. at 11) (citing *Pennhurst*, 465 U.S. at 101, 104 S.Ct. at 908). This argument overlooks that *Pennhurst* resolved whether the Eleventh Amendment shields a State official for violations of state law, not for violations of federal law. Additionally, the *Pennhurst* Court reiterated that there is an "important exception to this general rule: a suit challenging the constitutionality of a state official's action is not one against the State." *Pennhurst*, 465 U.S. at 102, 104 S.Ct. at 909 (citing *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714; *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974)). As noted above, this exception has since been expanded to violations of federal law.

The State defendants cite *Seminole Tribe* for the proposition that the *Ex Parte Young* doctrine is inapplicable in this action because the Food Stamp and Medicaid statutes only impose duties on the "State agency" and not on state officials. (State Defs.' Supp. Mem. at 11–12) (citing *Seminole Tribe*, 517 U.S. at 75 n. 17, 116 S.Ct. at 1133 n. 17). However, the Court in *Seminole Tribe* described the limited situation in which the *Ex Parte Young* doctrine is inapplicable—"where Congress prescribed a *detailed remedial scheme* for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based on Ex parte Young." *Seminole Tribe*, 517 U.S. at 74, 116 S.Ct. at 1132 (emphasis added). In fact, the Court specifically described the limited nature of its holding: "[W]e do not hold that Congress cannot authorize federal jurisdiction under Ex parte Young over a cause of action with a *limited remedial scheme*. We find only that Congress did not intend that result in the Indian Gaming Regulatory Act." *Seminole Tribe*, 517 U.S. at 74 n. 17, 116 S.Ct. at 1133 n. 17 (emphasis added). The "detailed remedial scheme" that exists in the Indian Gaming Regulatory Act, such as delineated procedures limiting the remedies that federal courts can impose in the event of a violation, is absent in the Food Stamp and Medicaid Acts. The State defendants' reliance on *Seminole Tribe* is therefore unavailing, and their motion to dismiss the complaint on Eleventh Amendment grounds must be denied.

## C. *Private Rights of Action*

 The State defendants contend that plaintiffs have no private right of action for violations of the Food Stamp Act, Medicaid Act, and the State cash assistance programs under either 42 U.S.C. § 1983 or under the statutes themselves. This argument also fails.

As discussed in *Reynolds I*, in order to state a cause of action under Section 1983, "a plaintiff must assert the violation of a

federal government will reimburse the State for a retroactive money judgment. *See generally Bennett v. White*, 865 F.2d 1395, 1407–08 (3d Cir.1989); *Bermudez v. Dep't of Agric.*,

490 F.2d 718, 721–24 (1973); *Harrington v. Blum*, 483 F.Supp. 1015, 1021–22 (S.D.N.Y. 1979); *Conrad v. Perales*, 92 F.Supp.2d 175, 180–81 (W.D.N.Y.2000).

federal right, not merely a violation of federal law." *Reynolds I*, 35 F.Supp.2d at 340 (citing *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 1359, 137 L.Ed.2d 569 (1997)); *see also Rodriguez v. DeBuono*, 162 F.3d 56, 60 (2d Cir.1998). In analyzing whether plaintiffs pled violations of federal rights pursuant to Section 1983, this Court previously found that the complaint stated viable causes of action for violations of specific provisions of the Food Stamp Act, namely, 7 U.S.C. § 2020(e)(2)(B) (requiring consideration of application on same day filed); 7 U.S.C. § 2020(e)(3) (requiring determination of eligibility within 30 days from date of application); 7 U.S.C. § 2020(e)(9) (requiring provision of coupons to eligible households within 7 days of application). *See Reynolds I*, 35 F.Supp.2d at 340–41 (citing cases); *see also Roberson*, 2000 WL 760300, at *10–11 (holding violations of 7 U.S.C. §§ 2014(b), 2020(e)(2)(B) and 2020(e)(9) and their implementing regulations enforceable through Section 1983).

This Court also found that plaintiffs stated Section 1983 claims for violation of the Medicaid Act, specifically, 42 U.S.C. § 1396a(a)(8) (requiring reasonably prompt Medicaid assistance), and its implementing regulations. *See Reynolds I*, 35 F.Supp.2d at 341 (citing cases).[32] Finally, this Court held that plaintiffs stated viable claims for violation of their Fourteenth Amendment procedural due process rights pursuant to Section 1983 in regard to receipt of food stamps, Medicaid, and cash assistance. *See Reynolds I*, 35 F.Supp.2d at 341 (citing cases); *see also Roberson*, 2000 WL 760300, at *10 n. 13 (procedural due process claim regarding receipt of food stamps enforceable under Section 1983); *Graus*, 2 F.Supp.2d at 544–45 (procedural due process claim regarding Medicaid enforceable under Section 1983).

Plaintiffs have therefore stated viable causes of action under Section 1983. This makes it unnecessary to decide whether plaintiffs have also stated claims directly under the Food Stamp and Medicaid Acts pursuant to *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). *See Reynolds I*, 35 F.Supp.2d at 340 n. 5 (citing cases); *see also Roberson*, 2000 WL 760300, at *10 n. 12.

### D. *Exhaustion of Administrative Remedies*

The State defendants argue that this action must be dismissed because "the individual plaintiffs have not pursued or exhausted their State administrative remedies or complained to the State defendants about the alleged improprieties at the City defendants' Job Centers." (State Defs.' Supp. Mem. at 29, 34) This Court disagrees that exhaustion is required.

 As discussed in the preceding section, the complaint asserts viable claims against the State defendants under 42 U.S.C. § 1983 for violations of federal law. This Court has already observed that exhaustion of administrative remedies is not required for such claims under Section 1983. *See Reynolds I*, 35 F.Supp.2d at 341 n. 9 (citing *Wilbur v. Harris*, 53 F.3d 542, 544 (2d Cir.1995); *Jose P. v. Ambach*, 669 F.2d 865 (2d Cir.1982)); *see also Patsy v. Board of Regents*, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982) ("exhaustion of state administrative remedies should not be required as a prerequisite to bringing an action pursuant to § 1983"); *DeSario v. Thomas*, 139 F.3d 80, 85–86 (2d Cir.1998), *vacated and remanded on other grounds by Slekis v. Thomas*, 525 U.S. 1098, 119 S.Ct. 864, 142 L.Ed.2d 767 (1999) (same); *Roberson*, 2000 WL 760300, at *11 ("[A]lthough both the Food Stamp Act and Medicaid statute require States to provide for administrative hear-

---

**32.** While the Second Circuit has not determined whether implementing regulations themselves create a federal right of action that may be the predicate for a Section 1983 action, courts may consider implementing regulations in determining whether a statute creates a federal right. *See Roberson*, 2000 WL 760300, at *10 n. 14 (citing cases).

ings when requested by recipients, the State defendants fail to point out any indication of congressional intent to require exhaustion of such remedies prior to brining a Section 1983 action.") (citations omitted).[33] Accordingly, the State defendants' motion to dismiss for failure to exhaust administrative remedies is denied.

### C. Factual Predicate For Claims Against The State Defendants

The State defendants contend that plaintiffs have failed to allege facts against them sufficient to state a claim. Specifically, the State defendants argue that: (1) plaintiffs have not alleged that a State policy, practice or custom deprived them of a federal right; (2) plaintiffs failed to provide notice of alleged deficiencies to the State by availing themselves of the fair hearing process; (3) plaintiffs' allegations against the State defendants are insufficiently pled.

### 1. State Policy, Practice, or Custom

The State defendants claim that plaintiffs' complaint fails to allege that any violations of plaintiffs' federal rights occurred pursuant to a State policy, custom or practice. The State defendants also contend that plaintiffs' acknowledgment that the City defendants, and not the State defendants, operate the income support centers and job centers undermines their claims against State defendants. (Compl. ¶ 17) Essentially, the State defendants argue that they are not accountable for the City defendants' mistakes.

Plaintiffs argue that the State defendants' have a duty to oversee and supervise the City defendants to ensure compliance with federal requirements. Plaintiffs offer three bases for this duty to supervise. First, plaintiffs contend that the State defendants' duty to oversee and supervise the City defendants arises as a non-separable component of their duty to administer the Food Stamp and Medicaid Acts in conformity with federal law. Thus, to the extent that claims lie against the City defendants for violations of specific provisions of the Food Stamp Act, the Medicaid Act, and the due process clause, see supra, those same claims would also lie against the State defendants for failing to ensure the City defendants' compliance.

Second, plaintiffs claim that under the Food Stamp and Medicaid Acts, the State defendants have an independent duty to oversee and supervise. In that regard, plaintiffs rely on specific provisions of the Food Stamp Act and its implementing regulations, see 7 U.S.C. § 2012(n) (defining "state agency"); 7 U.S.C. § 2020(d) (describing requirements for approval of state plan); 7 C.F.R. § 275.5 (requiring State review of local agency performance); 7 C.F.R. §§ 275.16, 275.18 (describing State corrective action plans), and the Medicaid Act and its implementing regulations, see 42 U.S.C. § 1396a(a)(1) (State plan mandatory on local administering agencies); 42 C.F.R. § 435.903 (requiring State to monitor local administering agencies' performance and take corrective action when necessary), and argue that these provisions create privately enforceable rights.

**33.** It may be noted that exhaustion is not required for claims brought directly under the Food Stamp and Medicaid Acts, see, e.g., Commonwealth of Mass. v. Lyng, 893 F.2d 424, 427 (1st Cir.1990) ("the scheme of the food stamp statute does not require exhaustion"); Alacare, Inc.-North v. Baggiano, 785 F.2d 963, 967–69 (11th Cir.), cert. denied 479 U.S. 829, 107 S.Ct. 111, 93 L.Ed.2d 59 (1986) (holding no exhaustion requirement in Medicaid cases). Additionally, exhaustion of administrative remedies by individual plaintiffs may be excused as futile in cases seeking

institutional reform. See generally Jose P., 669 F.2d at 868–69 ("Plaintiffs argued successfully below that ... the individual appeal mechanism is inappropriate to resolve the systematic compliance issues raised in the class actions."); J.G. v. Board of Educ., 648 F.Supp. 1452, 1457–58 (W.D.N.Y.1986) ("To require thousands of class members to go through individual administrative hearings, or to expect the hearing officer in one case to order system-wide change would be both impractical and futile."), aff'd 830 F.2d 444 (2d Cir.1987).

Finally, plaintiffs argue that the State defendants have a duty to provide the supervision and training necessary to prevent a violation of plaintiffs' constitutional and statutory rights. Plaintiffs contend that the State defendants have a policy, custom, or practice of failing to train and supervise adequately their employees or agents that is actionable under Section 1983.

■ The Court turns to plaintiffs' first theory of liability against the State defendants, *i.e.*, that implicit in the State defendants' duty to administer the Food Stamp and Medicaid Acts is an obligation to ensure local agency compliance with the requirements of those statutes. Since the Court finds that theory to be viable, it is unnecessary to reach plaintiffs' remaining arguments.

States participating in the Food Stamp and Medicaid programs may choose one of two ways in which to administer benefits: designate a single State agency to implement the programs, or operate the programs on a decentralized basis using local agencies. *See* 7 U.S.C. § 2012(n) (Food Stamp Act); 42 U.S.C. § 1396a(a)(1) (Medicaid Act). New York has chosen to administer the Food Stamp and Medicaid Acts on a decentralized basis, and HRA is one such local administering agency.

This statutory framework completely undercuts the State defendants' contention that they are not responsible when HRA fails to comply with requirements of the Food Stamp and Medicaid Acts. Congress placed the duty to administer the Food Stamp and Medicaid Acts on participating States, *see* 7 U.S.C. § 2020 (requirements for Food Stamp State plans); 42 U.S.C. § 1396a (requirements for Medicaid State plans), and that duty is non-delegable. In the context of decentralized administration of welfare programs, such as the case

here, the State defendants can only fulfill their statutory obligations if they actively oversee local administering agencies (such as the City defendants) and ensure statutory compliance. Thus, the duty to comply with federal statutory requirements is shared jointly by the State and City defendants.

Other courts have reached the same conclusion. In *Robertson v. Jackson*, 972 F.2d 529, the Fourth Circuit held that it was proper to enjoin the State agency responsible for administration of the Food Stamp Act to ensure that the local administering agencies fully complied with the requirements of the Act.[34] In rejecting the State's argument that it was not responsible for local agency compliance, the court cited to the Act's regulations and Congressional history in determining that "[a]lthough the state is permitted to delegate administrative responsibility for the issuance of food stamps, 'ultimate responsibility' for compliance with federal requirements nevertheless remains at the state level." *Robertson*, 972 F.2d at 533.

Food stamp regulations require the State to enter into a legal agreement with the USDA in which the State undertakes to administer the food stamp program in accordance with the statute, monitor compliance with federal law, and ensure that action is taken to correct deficiencies. *See* 7 C.F.R. §§ 272.2, 275.5, 275.16, 275.18, 275.19. Congressional history regarding the definition of "state agency," which was amended to include "the counterpart local agencies," *see* 7 U.S.C. § 2012(n), also contemplates that responsibility for administering the program remains at the state level:

> In essence, state welfare agencies are responsible for the day-to-day administration of the food stamp program (under Federal Rules) and a substan-

---

**34.** The fact that the decision failed to analyze whether plaintiffs' have a private right of action against the state for enforcement under the *Blessing* or *Cort* tests is irrelevant. That Court, like this Court now does, found that

the state has an enforceable obligation to oversee local administering agencies' compliance with federal law implied in their duty to administer.

tial portion of their administrative costs. In a number of states, these responsibilities are passed down to local welfare agencies because of the structure of the state's welfare system. *The state*, however, *remains ultimately responsible* and is the unit with which the [USDA] deals.

*Robertson*, 972 F.2d at 534 (quoting H.R.Rep. No. 95–464, 95th Cong., 1st Sess. 299 (1977), reprinted in 1977 U.S.C.C.A.N. 1971, 1704, 2235) (emphasis added).

This Court agrees with *Robertson's* holding that a State that chooses to operate its food stamp program on a decentralized basis "cannot thereby diminish the obligation to which the state, as a state, has committed itself, namely, compliance with federal requirements governing the provision of the food stamp benefits that are funded by the federal government." *Robertson*, 972 F.2d at 534; *see also Woods v. United States*, 724 F.2d 1444, 1447 (9th Cir.1984) ("While the state may choose to delegate some administrative responsibilities, the 'ultimate responsibility for operation of the [food stamp] plan remain[s] with the state.'") (quoting *California v. Block*, 663 F.2d 855, 858 (9th Cir. 1981)). The same rationale applies to the State's obligations under the Medicaid Act. *See generally Hillburn v. Maher*, 795 F.2d 252, 260 (2d Cir.1986) ("[T]he reason for the requirement that a state designate a 'single State agency' to administer its Medicaid program, was to avoid a lack of accountability for the appropriate operation of the program.") (quoting 42 U.S.C. § 1396a(a)(5)).

The State defendants have a similar duty to oversee compliance with the State cash assistance programs to ensure against unconstitutional actions by the local agencies. *See Moore v. Perales*, 692 F.Supp. 137, 143 (E.D.N.Y.1988) ("Under AFDC, it is the state agency that is ultimately responsible; it must account to the federal government."); *Beaudoin v. Toia*, 45 N.Y.2d 343, 347–48, 408 N.Y.S.2d 417, 419, 380 N.E.2d 246 (1978) ("In the admin-

istration of public assistance funds, whether they come from Federal, State or local sources, . . . the local commissions act on behalf of and as agents for the State. . . . Inasmuch as New York State has elected to participate in the Federal aid to families with dependent children program . . . , the State is required to comply with the applicable Federal statute and regulations").

Accordingly, this Court determines that implicit in the State's obligations to administer the Food Stamp Act, Medicaid Act, and cash assistance programs is a duty to oversee the City defendants' administration of the programs to ensure compliance with federal law. The City defendants' failure to comply with the specific requirements of the Food Stamp and Medicaid Act, or their deprivation of plaintiffs' due process rights in connection with the food stamps, Medicaid and cash assistance programs, gives rise to corresponding Section 1983 claims against the State defendants.

### 2. *Notice of Alleged Deficiencies Through the Fair Hearing Process*

The State defendants contend that one primary way in which the State implements the Food Stamp and Medicaid Acts is by providing applicants and recipients with the right to administrative fair hearings to redress their grievances with local agency actions. The State defendants argue that the majority of plaintiffs have failed to avail themselves of the fair hearing process, and therefore cannot allege that the State defendants failed to supervise.

■ The Court rejects this argument. As discussed above, plaintiffs are not required to exhaust their administrative remedies. Additionally, the State defendants have an independent duty to investigate the City defendants' performance and act in an ongoing oversight capacity to ensure their compliance with federal mandates separate and apart from the fair hearing process. *See supra* Section E.1.

### 3. *Sufficiency of Pleadings*

Finally, the State defendants contend that the allegations against them are conclusory. The complaint alleges that the State defendants' "failure to properly oversee and supervise the City defendants' administration of the food stamps and Medicaid programs violates plaintiffs' and plaintiff class members' rights...." (Compl. ¶ 265; *see also* Compl. ¶¶ 5, 266, Request for Relief b. (viii), e.) As factual support for these allegations, plaintiffs enumerate the ways in which the City defendants fail to meet the statutory mandates of the Food Stamp and Medicaid Acts, and fail to provide due process in connection with the food stamps, Medicaid and cash assistance programs. *See* Compl. ¶¶ 68–105. As discussed above, *see supra* Section E.1., the State defendants are obligated to ensure that the City defendants implement these programs in accord with federal constitutional and statutory requirements.

▮▮▮▮ The Supreme Court has held that there is no heightened pleading standard for civil rights actions alleging municipal liability under Section 1983. *See Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 1163, 122 L.Ed.2d 517 (1993). The *Leatherman* Court rejected the argument that "a plaintiff must do more than plead a single instance of misconduct" and held that a complaint need only include "a short plain statement of the claim showing that the pleader is entitled to relief." *Leatherman,* 507 U.S. at 167–68, 113 S.Ct. at 1162–63 (citing Fed.R.Civ.P. 8(a)(2)). Here, the complaint easily satisfies this standard.[35]

**35.** Because this Court finds that the complaint makes sufficient allegations to survive a motion to dismiss, it need not reach plaintiffs' request to amend the pleadings pursuant to Fed.R.Civ.P. 15(b) in accord with the evidence presented at the January 1999 evidentiary hearing. However, it is worth noting

Accordingly, the State defendants' motion to dismiss for failure to allege sufficient facts against them is denied.

### III. *Plaintiffs' Motion For Class Certification*

Plaintiffs move to certify a class consisting of "[a]ll New York City residents who have sought, are seeking, or will seek to apply for food stamps, Medicaid, and/or cash assistance at a Job Center." (Compl. ¶ 61) Defendants oppose plaintiffs' motion for class certification on the following grounds: (1) the proposed class is amorphous and not readily capable of being ascertained; (2) it is unnecessary; and (3) it would make plaintiffs' request for certain relief unmanageable. For the reasons set forth below, plaintiffs' motion for class certification is granted.

#### A. *Standard for Class Certification*

Federal Rule of Civil Procedure 23 establishes two prerequisites for class actions. First, the party seeking class certification must prove that the proposed class meets the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See* Fed.R.Civ.P. 23(a); *Caridad v. Metro–North Commuter R.R.,* 191 F.3d 283, 291 (2d Cir.1999); *Marisol A. v. Giuliani,* 126 F.3d 372, 375 (2d Cir.1997). Second, the party seeking class certification must show that the proposed class action falls within one of the types of class actions maintainable under Rule 23(b): (1) prosecution of separate actions by individual parties

that at that hearing, plaintiffs presented evidence that would further support their claims against the State defendants for deficiencies in monitoring and correcting failures to comply with federal constitutional and statutory requirements by the City defendants.

would create a risk of either inconsistent adjudications or would be dispositive of the interest of those members not parties to the adjudication; (2) defendants have acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to members of the class predominate, and a class action is superior to other available methods for adjudication. *See* Fed.R.Civ.P. 23(b); *Caridad,* 191 F.3d at 292; *Marisol A.,* 126 F.3d at 376.

■■■■■■ When considering a motion for class certification, courts should consider the allegations in the complaint as true. *See Shelter Realty Corp. v. Allied Maintenance Corp.,* 574 F.2d 656, 661 n. 15 (2d Cir.1978) ("it is proper to accept the complaint allegations as true in a class certification motion"). A court may not examine the merits of the case in a motion for class certification. *See Caridad,* 191 F.3d at 291 (citing *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152 (1974)). However, a court may consider material outside the pleadings in determining the appropriateness of class certification. *See Kaczmarek v. International Business Machines Corp.,* 186 F.R.D. 307, 311 (S.D.N.Y.1999) (citing *Sirota v. Solitron Devices, Inc.,* 673 F.2d 566, 571 (2d Cir.1982)).

**B.** *Requirements of Federal Rule of Civil Procedure 23(a)*

**1.** *Numerosity*

■■■ Turning to the first requirement under Rule 23(a), plaintiffs must show that the proposed class is so numerous that joinder of all members is impracticable. Impracticable does not mean impossible, but simply difficult or inconvenient. *See Robidoux v. Celani,* 987 F.2d 931, 935 (2d Cir.1993).

■■■ Plaintiffs contend that "[u]pon information and belief, thousands of families and individuals apply for food stamps, Medicaid, and cash assistance from City defendants each month. Because City de-

fendants deter, discourage, and prevent many of those who seek to file applications at Job Centers from filing those applications, the identify of many plaintiff class members is unknown to plaintiffs and, therefore, joinder is impracticable." (Compl. ¶ 62) *See also* Smith Decl. ¶ 3 (centers processed approximately 168,000 public assistance applications in 1999). These figures satisfy the numerosity requirement. *See, e.g., Marisol A.,* 126 F.3d at 376 (class of thousands "obviously numerous"); *Consolidated Rail Corp. v. Town of Hyde Park,* 47 F.3d 473, 483 (2d Cir.1995) (numerosity presumed at forty); *Morel v. Giuliani,* 927 F.Supp. 622, 633 (S.D.N.Y.1995) (24,000 class members satisfies the numerosity requirement); *Cutler v. Perales,* 128 F.R.D. 39, 44 (S.D.N.Y. 1989) (certifying class estimated "to be in the thousands").

Other reasons make joinder impracticable. Plaintiffs allege that the identity of may plaintiff class members is unknown to them, thus making joinder extremely difficult, if not impossible. (Compl. ¶ 62) Class members' lack of financial resources also makes joinder difficult. *See Robidoux,* 987 F.2d at 936 (financial resources of plaintiffs a factor in impracticability of joinder). Additionally, the fluid nature of the class further supports this Court's finding that joinder is impracticable. *See, e.g., Andre H. v. Ambach,* 104 F.R.D. 606, 611 (S.D.N.Y.1985) ("The fact that the population ... is constantly revolving establishes sufficient numerosity to make joinder of the class members impracticable."); *Jane B. v. New York City Dep't of Soc. Servs.,* 117 F.R.D. 64, 70 (S.D.N.Y.1987) ("the fluid composition of the populations ... [makes] joinder ... impracticable"); *Arthur v. Starrett City Assocs.,* 98 F.R.D. 500, 505–06 (E.D.N.Y.1983) ("This fluctuating nature of the pool of prospective plaintiffs further demonstrates the impracticability of joinder.").

■■■ City defendants contend that this Court should deny plaintiffs' motion for

class certification because the proposed class is amorphous and not readily capable of being ascertained. However, precise enumeration or identification of class members is not required. *See Robidoux,* 987 F.2d at 935. Courts have rejected this argument and certified similarly defined classes in other welfare benefit cases. *See, e.g., Morel,* 927 F.Supp. at 633–35 (rejecting argument that class of "[a]ll residents of New York City who have received, receive, or will receive AFDC, Food Stamps or Home Relief benefits who have requested, are requesting or will request a fair hearing in response to an action by the City agency to discontinue, suspend, reduce or restrict benefits and are entitled to aid continuing" is "not precisely drawn" and certifying the class); *Brown v. Giuliani,* 158 F.R.D. 251, 269 (E.D.N.Y.1994) (rejecting argument that certification of class of "all residents of New York City who are recipients of AFDC and who have or will request change of circumstance grants under the AFDC and EAF programs and whose requests are not disposed of promptly" should be denied because "the bounds of the class are not precisely drawn," stating that "[a] class is clearly delineated if confined to eligible recipients of a government aid program," and certifying the class).

## 2. *Commonality and Typicality*

■ The next two requirements of Rule 23(a) are commonality and typicality. "The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A.,* 126 F.3d at 376. The crux of both requirements is to ensure that "maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Marisol A.,* 126 F.3d at 376 (quoting *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2371 n. 13, 72 L.Ed.2d 740 (1982)). The commonality re-

quirement is met if the plaintiffs' complaints share a common question of law or fact, *see Marisol A.,* 126 F.3d at 376; *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 166–67 (2d Cir.1987), while the "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability . . . irrespective of minor variations in the fact patterns underlying the individual claims." *Robidoux,* 987 F.2d at 936–37.

■ Here, plaintiffs have met the commonality and typicality requirements. Common questions of law and fact in this action include: (1) whether defendants unlawfully deter individuals from applying for food stamps, Medicaid, and cash assistance, and (2) whether defendants process applications for food stamps, Medicaid, and cash assistance in accord with applicable federal and state laws. The commonality and typicality requirements are met in this action because the named plaintiffs' claims arise from the same course of conduct that gives rise to the claims of all the class members and are based on the same legal theories. *See Drexel Burnham Lambert,* 960 F.2d at 291; *Escalera v. New York City Housing Authority,* 425 F.2d 853, 867 (2d Cir.1970); *Morel,* 927 F.Supp. at 633.

■ Defendants claim that because each class member faces his or her own set of individual factual circumstances, the commonality and typicality requirements are not met. However, variations in the fact patterns of individual plaintiffs do not vitiate the commonality and typicality claims. *See Robidoux,* 987 F.2d at 937; *Jane B.,* 117 F.R.D. at 70. This argument has been raised and rejected in other cases involving welfare benefits. *See Marisol A.,* 126 F.3d at 377 (commonality and typicality requirements met where "plaintiffs allege that their injuries derive from a unitary course of conduct by a single system"); *Morel,* 927 F.Supp. at 633–34 (rejecting argument that definition of class

would "require the Court to examine the individual circumstances of each claimant" and noting that "every proposed class requires a determination as to an individual's membership, and that [ ]determination does not defeat the identification of the class itself"); *Brown*, 158 F.R.D. at 268 (rejecting argument that "there are no questions of fact common to the class as a whole and that plaintiffs' claims are atypical ... [because of] the individual injuries suffered by each named plaintiff" and stating that "the overarching questions of fact are common to all class members, namely, whether defendants have failed to make timely determinations of [welfare] applications" and "the individual facts unique to each named plaintiff are merely methods of proving the ultimate fact"). Like the *Marisol A.* court, this Court believes "the myriad [of] constitutional, regulatory and statutory provisions invoked by the plaintiffs are properly understood as creating a single scheme for the delivery of ... welfare and as setting standards of conduct for those charged with providing such services—standards that the defendants are alleged to have violated in a manner common to the plaintiff class...." *Marisol A.*, 126 F.3d at 376. This is sufficient to meet the commonality and typicality requirements.

### 3. *Adequacy*

 The adequacy of representation requirement entails two factors: (1) class counsel must be qualified, experienced and generally able to conduct the litigation, and (2) the interests of the named plaintiffs cannot be antagonistic to those of the remainder of the class. *See Marisol A.*, 126 F.3d at 378; *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 290 (2d Cir.1992). Both factors are met in this case.

This Court is convinced that plaintiffs' counsel can adequately represent the class since they are experienced in class action litigation (Compl. ¶ 66), and have demonstrated throughout these proceedings that they will vigorously prosecute plaintiffs' claims.

 The Court also believes that the named plaintiffs are able to fairly represent the class. "[O]nly a conflict that goes to the very subject matter of the litigation will defeat a party's claim of representative status." *Kuck v. Berkey Photo, Inc.*, 81 F.R.D. 736, 740 (S.D.N.Y.1979) (quoting 7 Wright & Miller, Federal Practice & Procedure § 1768, at 639 (1972)); *see also In re Joint Eastern and Southern Dist. Asbestos Litig.*, 78 F.3d 764, 778 (2d Cir. 1996) (rejecting plaintiffs' inadequacy of representation claim where there was no indication that their claims were antagonistic to the claims of any other class members). The interests of the named plaintiffs appear to be identical to those of the proposed class because all are subject to the same allegedly unconstitutional actions by defendants. Both the named plaintiffs and the class members seek declaratory and injunctive relief to assure that defendants' actions comply with their constitutional and statutory rights. Thus, if the named plaintiffs prevail, all class members will benefit. Accordingly, plaintiffs have met each of the requirements of Rule 23(a).

### C. *Federal Rule of Civil Procedure 23(b) Requirements*

 Plaintiffs allege that their proposed class action is maintainable under Rule 23(b)(2)—that defendants have acted on grounds generally applicable to the class, making appropriate injunctive or declaratory relief with respect to the class as a whole. *See* Fed.R.Civ.P. 23(b)(2). This Court agrees. The City defendants have improperly deterred individuals from applying for food stamps, Medicaid, and cash assistance, and failed to process applications within the statutorily mandated time periods. *See Reynolds I*, 35 F.Supp.2d at 341–47. The State defendants have failed to oversee the City defendants' compliance with welfare laws. *See supra*. Such actions by defendants make plaintiffs' re-

quest for injunctive and declaratory relief with respect to the class as a whole appropriate. *See Marisol A.*, 126 F.3d at 378; *Comer v. Cisneros*, 37 F.3d 775, 796 (2d Cir.1994) (Rule 23(b)(2) satisfied where "the plaintiffs seek injunctive relief and they predicate the lawsuit on the defendants' acts and omissions with respect to" the class); Advisory Committee Note to Subdivision (b)(2) ("Illustrative are various actions in the civil-rights field where a party is charged with discriminating unlawfully against a class, usually one whose members are incapable of specific enumeration.") Accordingly, this Court finds that plaintiffs have met the requirements of Rule 23 for class certification.

### D. *Necessity*

The City defendants argue that class certification is not necessary because the proposed class would, as a practical matter, benefit from any relief ordered in this action. They further contend that this Court can fashion any relief granted in a manner that will have class-wide effect, thus making certification unnecessary and inappropriate.

 The Second Circuit has held that a district court need not certify a class where class certification is largely a formality. *See Berger v. Heckler*, 771 F.2d 1556, 1566 (2d Cir.1985); *Galvan v. Levine*, 490 F.2d 1255, 1261 (2d Cir.1973); *Vulcan Society v. Civil Service Comm'n*, 490 F.2d 387, 399 (2d Cir.1973). In affirming the district court's refusal to certify a class, the *Galvan* Court reasoned:

> *[I]nsofar as the relief sought is prohibitory,* an action seeking declaratory and injunctive relief against state officials on the ground of unconstitutionality of a statute or administrative practice is the archetype of one where class action designation is largely a formality, at least for the plaintiffs.... [W]hat is important in such a case for the plaintiffs, or more accurately, for their counsel, is that the *judgment* run to the benefit not

only of the named plaintiffs but of all others similarly situated.

*Galvan*, 490 F.2d at 1261 (first emphasis added) (second emphasis in original). City defendants claim that in this action, class certification would likewise be a formality.

District courts have held that the *Galvan* rule only applies when the relief sought by plaintiffs is prohibitory. *See Cutler*, 128 F.R.D. at 46; *Jane B.*, 117 F.R.D. at 72; *Milburn v. Coughlin*, No. 79 Civ. 5077 (S.D.N.Y. Nov. 26, 1980); *Folsom v. Blum*, 87 F.R.D. 443, 445 (S.D.N.Y. 1980); *Monaco v. Stone*, 187 F.R.D. 50, 63 (E.D.N.Y.1999); *Ashe v. Board of Elections*, 124 F.R.D. 45,50 (E.D.N.Y.1989). In *Cutler*, the court found the *Galvan* rule inapplicable where plaintiffs "seek relief that would require defendants to take affirmative steps to remedy existing unconstitutional conditions ... and to implement standards that comport with the mandates of federal and state laws and regulations." *Cutler*, 128 F.R.D. at 46 (quoting *Jane B.*, 117 F.R.D. at 72); *accord Monaco*, 187 F.R.D. at 63; *Ashe*, 124 F.R.D. at 51. Much like the plaintiffs in those cases, plaintiffs here seek affirmative injunctive relief to compel the City defendants to process applications for cash assistance, Medicaid, and food stamps in a manner consistent with plaintiffs' rights under the federal and state statutory and regulatory scheme and compel State defendants to oversee the City defendants' administration of those welfare systems. *See* Compl. Request for Relief (d), (e), and (f). Because the relief requested by plaintiffs is not purely prohibitory, the *Galvan* rule is not a barrier to this Court's granting of class certification.

 Even if, *arguendo*, the *Galvan* rule were applicable to this action, class certification is not a mere formality because it will insure against the danger of this action becoming moot. This case involves a fluid class where the claims of the named plaintiffs may become moot prior to completion of this litigation. The danger of mootness is magnified by the fact that

defendants have the ability to moot the claims of the named plaintiffs, thereby evading judicial review of their conduct. Thus, this Court, like other courts under these circumstances, believes that class certification is necessary. *See Greklek v. Toia*, 565 F.2d 1259, 1261 (2d Cir.1977) (affirming district court's grant of class certification in action requesting declaratory and injunctive relief "since only class certification could avert the substantial possibility of the litigation becoming moot prior to the decision"); *Alston v. Coughlin*, 109 F.R.D. 609, 612 (S.D.N.Y.1986) ("[t]he plaintiff's interest in averting the possibility of the action becoming moot, with the concomitant interest in judicial economy, makes class certification in this case more than an empty formality"); *Jane B .*, 117 F.R.D. at 72 ("[a]n additional reason for granting the motion for certification lies in avoiding problems of mootness"); *Ashe*, 124 F.R.D. at 51 ("[a] further ground for finding class certification to be more than a 'formality' here is to avoid the danger of the individual plaintiffs' claims becoming moot before a final adjudication"); *Koster v. Perales*, 108 F.R.D. 46, 54 (E.D.N.Y. 1985) (class certification is necessary when "absent certification, there is a substantial danger of mootness"). Accordingly, plaintiffs' motion for class certification is granted.

### E. *Appropriateness as to Requested Relief*

█ Finally, the City defendants argue that class certification should be denied because plaintiffs are seeking "retroactive damages" in addition to declaratory and injunctive relief, thus making certification "unmanageable." (City Defs.' Mem. at 8) This Court disagrees with the City defendants' characterization of the relief requested by plaintiffs. The complaint seeks, *inter alia*, an order requiring the City defendants to identify and reprocess the applications of those class members whose applications were wrongly denied. (Compl., Request for Relief f(i)). This request is for injunctive relief, not for retro-

active money damages. Even assuming the Court granted this relief, the City defendants' concern that countless mini-trials would be necessary to implement it is pure speculation.

For the reasons set forth above, plaintiffs' motion to certify as a class all New York City residents who have sought, are seeking, or will seek to apply for food stamps, Medicaid, and/or cash assistance at a Job Center is granted.

### Conclusion

For the reasons set forth above, the City defendants' motion to vacate the preliminary injunction is denied; the State defendants' motion to dismiss the complaint is denied; and the plaintiffs' motion for class certification is granted.

The Court will conduct a status conference with all counsel on August 4, 2000 at 3:45 p.m. in Courtroom 618.